No. 40,371

CENTRAL KANSAS POWER COMPANY, a corporation, *Appellee*, v. THE
STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, et al.,
KANSAS-NEBRASKA NATURAL GAS COMPANY, INC., *Appellants.*

(316 P. 2d 277)

Opinion filed October 9, 1957.

*Harold E. Jones,* Assistant General Counsel, of Topeka, argued the cause, and *C. C. Lindley,* General Counsel, and *Charles R. Escola,* Acting General Counsel, of Topeka, were with him on the briefs for appellant State Corporation Commission. *Douglas Gleason,* of Ottawa, argued the cause, and *James D. Conway,* of Hastings, Nebraska, was with him on the briefs for appellant Kansas-Nebraska Natural Gas Company, Inc.

*Louis R. Gates,* of Kansas City, argued the cause, and *Norman W. Jeter,* of Hays, was with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: These two appeals are from a judgment of the district court of Ellis County vacating and setting aside as unreasonable two orders of appellant State Corporation Commission, hereafter referred to as the commission, entered on the application of appellant Kansas-Nebraska Natural Gas Company, Inc., hereafter referred to as Kansas-Nebraska, insofar as those orders affected appellee Central Kansas Power Company, hereafter referred to as Central.

Both Kansas-Nebraska and Central are Kansas corporations and are public utilities engaged in the production, purchase, sale, transmission and distribution of natural gas in Kansas. Kansas-Nebraska's principal office is in Phillipsburg, Kansas, and Central's principal office is in Abilene, Kansas.

A brief background of each utility will be helpful. Kansas-Nebraska produces and purchases gas in Kansas, Oklahoma, Colorado and Nebraska, and transmits and distributes it through its pipe line system to wholesale and retail customers in Kansas, Nebraska, and to a limited extent in Colorado. It has two main pipe lines: the first, originating in the Hugoton field and extending northward to serve principally cities, which is termed the Oakley line, thence into Nebraska; the second, which is referred to as its predominant line, reaches the Hugoton field south from Kearny County and

runs northeasterly from a point in that county to WaKeeney, thence to Phillipsburg and Stockton where it is joined with a line that procures gas from the Pawnee-Unruh area. Since April 1944 Kansas-Nebraska has purchased approximately 96 percent of its gas, 84 percent of which was secured from the Hugoton field in Kansas. Of the gas purchased and produced in Kansas, approximately 36 percent was sold and distributed in Kansas, while approximately 64 percent was sold and distributed in Nebraska. Kansas-Nebraska serves 50 communities in western Kansas—ten at wholesale, either directly from its transmission line to a purchaser who transports the gas in its own pipe lines to points of distribution, or by delivery to the distribution system of the purchaser at the "town border"; and 40 in which it makes sales of gas to retail customers in the community through its own distribution system. During 1953 Kansas-Nebraska served gas in Kansas to an average of 12,384 residential, 2,446 commercial, and 148 industrial customers. It also made direct sales from its transmission system to industrial and institutional customers in Kansas.

Central owns a gas pipe-line system in central and western Kansas and is engaged in the transmission, distribution and resale of gas which it purchases from Kansas-Nebraska. In addition, it owns and operates electric generating plants located at Colby, Atwood, Hoxie and Hill City, interconnected to permit transmission of electric power from each plant to cities in the areas served.

On April 3, 1944, Kansas-Nebraska, having contracts for a supply of gas from the Hugoton field and desiring to construct a second pipe line from a point in Kearny County northeasterly to WaKeeney and Stockton, entered into a contract whereby it agreed to sell and deliver, and Central agreed to purchase, all of the gas Central might require for resale to customers then or thereafter connected to its distributing system at a price of 6 cents per M. c. f. to be delivered to Central's transmission system at WaKeeney, or at an emergency delivery point at Toulon, Kansas. This agreement is referred to as the WaKeeney contract and was effective until September 1, 1959. It was amended by supplemental agreements of April 4, 1946, and May 22, 1950, and also by orders of the commission entered February 18, 1949, and December 2, 1953. Together with its supplements, it was filed with the commission pursuant to G. S. 1949, 66-108, and remained in effect until abrogated by the commission as hereafter detailed.

The WaKeeney contract was beneficial to both utilities. Central held franchises for the retail sale of gas in Hays, Ellis and Wa-Keeney. Although it owned producing gas wells, production was insufficient to insure performance of the franchises and the contract guaranteed Central adequate gas reserves. The contract assisted Kansas-Nebraska in financing the construction of the second pipe line: it provided a minimum return by requiring Central to pay a maximum demand charge on 5,000,000 c. f. deliveries, regardless of whether that amount was needed, but Kansas-Nebraska was obligated to deliver to Central only such gas as was available from its then source of supply. Central agreed to refrain from sale or delivery of gas to any additional customers for resale without Kansas-Nebraska's approval. Lateral lines were not required to establish service to Central, and it (Central) provided a site for Kansas-Nebraska's metering and regulation system at WaKeeney. The contract further provided that Kansas-Nebraska had the right, upon 60 days notice to Central, to require reconsideration of the price if the combined amount of its labor and tax costs were increased by 100 percent or more.

On May 22, 1950, a second supplement to the WaKeeney contract increased the price of gas to Central to 11 cents per M. c. f. and contained an escalator clause which provided that if the commission's order of February 18, 1949, establishing a minimum 8-cent wellhead price was sustained by the courts, Central would pay an additional 2 cents per M. c. f. for all gas produced after March 1, 1950. This order was sustained by this court October 7, 1950 (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P. 2d 704), and Central was billed from March 1, 1950, accordingly. The escalator clause further provided that in the event any other order be made by any authorized federal or state agency increasing the wellhead cost of gas in the Hugoton field in excess of 6 cents per M. c. f., Kansas-Nebraska could charge any or all cost to Central. On December 2, 1953, the commission established a minimum wellhead cost of 11 cents per M. c. f. as a condition for the withdrawal of gas from the Hugoton field. That order was sustained by this court December 8, 1956 (*Cities Service Gas Co. v. State Corporation Commission,* 180 Kan. 454, 304 P. 2d 528). However, Central was billed in accordance with this order from January 1, 1954, its effective date.

In addition to the WaKeeney contract, the utilities entered into

what is referred to as the Colby contract of July 1, 1952, supplemented on August 1, 1952, whereby Kansas-Nebraska agreed to furnish Central's gas fuel requirements for its electric generating plants at Colby, Atwood, Hoxie and Hill City. This contract contained a schedule of rates and an escalator clause providing that the price to Central was to be increased to reflect any increase in price at the wellhead above 8½ cents per M. c. f. This contract and its supplement were filed with the commission pursuant to G. S. 1949, 66-108, and the rates therein prescribed were in effect when Kansas-Nebraska filed its application with the commission hereafter referred to.

The WaKeeney contract and its supplements and the minimum wellhead price in the Hugoton field established by the commission December 2, 1953, increased Central's cost of gas approximately $103,600. As hereafter indicated, Kansas-Nebraska sought additional revenue of $129,614 by schedules of increased rates and classifications of gas sold to Central, which, together with Central's other gas price increase, resulted in a total increase of $233,181 over that paid prior to midyear 1953. In addition, Kansas-Nebraska's proposed schedules of increased rates and classifications sought additional revenue with respect to the Colby contract and its supplement of $11,714; thus resulting in 81.4 percent increase in cost of gas to Central over that of midyear 1953. Notwithstanding the increased cost of gas under the WaKeeney and Colby contracts, Central did not increase its rates nor did it apply to the commission for a rate increase.

On March 3, 1954, with the WaKeeney and Colby contracts in effect, Kansas-Nebraska filed its application with the commission seeking approval of proposed tariffs setting up increased rates and classifications for all gas sold and delivered in Kansas in the amount of $552,794 annually, and for modification of all existing gas sale contracts. It was alleged the application was filed pursuant to G. S. 1949, 66-117, and that a test period commencing November 30, 1952, and ending November 30, 1953, was used as a basis for calculating additional revenue. The commission set the application for hearing and since it involved numerous users of gas, directed that notice be served upon all of Kansas-Nebraska's customers and other interested parties including Central. Central protested the application, as did other customers, particularly as it applied to its contract rates. The hearing on the application was lengthy, lasting nine days; 83 exhibits

were offered, and the transcript contained 867 pages of testimony. At the close of the hearing the commission took the matter under advisement, and on October 6, 1954, issued its memorandum opinion and order.

We think it unnecessary to summarize the commission's memorandum opinion. Suffice it to say the opinion made specific reference to various Kansas-Nebraska exhibits; to various Kansas-Nebraska applications to the Federal Power Commission; to various contracts entered into concerning its new development in Oklahoma; to its expansion program in Nebraska; to its activities in Colorado; to its Kearny and Deerfield contracts, but no mention or reference was made, even indirectly, to Central, or to the contracts between Kansas-Nebraska and Central, nor to any activities, developments, expansion, or rates in regard to them; nor was there a finding that the rates prescribed in those contracts were unreasonable, unjust, unjustly discriminatory or unduly preferential. The findings and conclusions of the commission's memorandum opinion read:

"From the foregoing we *find* as a practical matter that Kansas-Nebraska is entitled to additional revenues applicable to its Kansas operations. We, therefore, *conclude* that the application of Kansas-Nebraska in these proceedings should not be granted as requested, but the company will be permitted to file for our approval under G. S. 1949, 66-117, a new schedule of rates that will produce not to exceed additional revenue of $462,500.00 instead of $552,-794.00 for the test period." (Emphasis supplied.)

The commission ordered:

"That the application be and the same is hereby denied.

"That Kansas-Nebraska Natural Gas Company may file new schedules of rates and classifications for approval that will produce not to exceed $462,500.00 additional revenue for the test period hereinbefore referred to.

"That Kansas-Nebraska file each and every current contract that it has entered into with each and every customer for gas service.

"The Commission retains jurisdiction of the subject matter and the parties for the purpose of issuing such further order or orders as from time to time it may deem necessary."

On October 14, 1954, pursuant to G. S. 1949, 66-118b, Central, as well as other protesting cities and customers, filed its application for a rehearing with the commission, which was denied October 25, 1954.

In the meantime and on October 8, 1954, Kansas-Nebraska, as directed by the commission's order of October 6, 1954, filed new schedules of rates and classifications under a different docket num-

ber than that given its original application, raising the rates and classifications of its customers including Central in order to secure additional revenue in the amount of $462,500. The commission entered its approval of the new schedules on October 8, 1954.

On November 15, 1954, pursuant to G. S. 1949, 66-118c Central filed its application for review of the commission's orders of October 6, 1954, and October 25, 1954, with the district court of Ellis County, Kansas, and moved for a stay of the commission's orders (G. S. 1949, 66-118g). The district court directed that notice be given the commission that the motion to stay would be heard December 15, 1954, or as soon thereafter as practicable. Kansas-Nebraska filed its application to intervene, which was granted, and on April 13, 1955, the district court stayed the orders of the commission as of December 15, 1954.

On April 9, 1955, the commission filed a motion to dismiss Central's application for review on the ground that the district court was without jurisdiction of the subject matter and the parties, which was overruled April 13, 1955.

On February 6, 1956, Central's application for review was heard. The commission and Kansas-Nebraska were present by counsel, and filed written abstracts and briefs with the court. Upon conclusion of oral argument, the district court took the matter under advisement, and invited counsel to submit suggested findings of fact and conclusions of law. On February 21, 1956, the district court, having considered the transcript of the proceedings before the commission, the abstracts, briefs, suggested findings of fact and conclusions of law, and argument of counsel, made extensive findings of fact, which we summarize: That the memorandum opinion and order of October 6, 1954, and the order denying rehearing of October 25, 1954, were unreasonable insofar as they affected Central for the reason that those orders abrogated the WaKeeney and Colby contracts and supplements since, as set forth in finding No. 7, the commission gave no consideration to, and in effect held as immaterial, whether those contracts were invalid, unlawful or unreasonable as it made no finding, express or implied, on such matters.

The court further found that the WaKeeney and Colby contracts and their supplements were on file with the commission and the rates therein provided were approved and in effect at the time of the test period; that continued performance of those contracts would only affect the net profits or dividends of Kansas-Nebraska on that

portion of its property devoted to the performance of the contracts; that those contracts were not contrary to public policy nor were they prejudicial to or discriminatory against the public or other gas customers of Kansas-Nebraska; that they were valid, enforceable, lawful, and reasonable, and that the procedure culminating in the memorandum opinion and order of October 6, 1954, and the order denying rehearing on October 25, 1954, was in compliance with the laws of Kansas, and that said orders were not unlawful. The court concluded, as follows:

"1. A contract for rates with a public utility cannot be abrogated except after a finding that such contract is unlawful or unreasonable.

"2. An order of the Commission cannot be vacated upon review by the District Court except upon finding that such order is unlawful or unreasonable.

"3. The Contracts and questions or issues in connection therewith, set out in finding of fact number (7) above, are material.

"4. The Orders of the State Corporation Commission of the State of Kansas, dated October 6, 1954, and October 25, 1954, insofar as they affect the Central Kansas Power Company are unreasonable for the reasons stated in the Findings of Fact and Conclusions of Law herein, and should be vacated and set aside insofar as they affect Central Kansas Power Company."

The district court rendered judgment in accordance with its findings of fact and conclusions of law. Post trial motions of the commission and Kansas-Nebraska to set aside findings of fact and conclusions of law, and for a new trial, were overruled. Thereafter each perfected separate appeals.

A preliminary question requires our attention. Both appellants infer in their briefs and stated in oral argument that the district court erred in overruling the commission's motion to dismiss the review proceedings. The contention is that the order of October 6, 1954, and the order of October 25, 1954, denying rehearing, disapproved the schedules of rates originally proposed by Kansas-Nebraska under G. S. 1949, 66-117; consequently, those orders did not abrogate Central's contracts nor fix new rates for them. Further, that the action which Central primarily complains of, and which the district court adjudged unreasonable, did not take place until the commission approved the new schedules on October 8, 1954, filed by Kansas-Nebraska on that date; and, that neither Central's application for rehearing nor its application for review challenged the action taken by the commission on October 8, 1954. The proper procedure, appellants assert, was for Central to attack the order of October 8, 1954, by filing a complaint with the commission under

G. S. 1949, 66-110 alleging the new schedules of rates were unlawful and unreasonable.

The contention begs the question. The order of October 6, 1954, approved Kansas-Nebraska's proposed rates to the extent of approximately 84 percent of that sought in its application, and ordered it to file new schedules of rates and current contracts to conform with this additional revenue allotment. That order was the basis for the filing of new schedules of rates and classifications and was the authority to Kansas-Nebraska to increase Central's rates, as well as all other customers. Kansas-Nebraska's application raised the issue of whether it was in need of additional revenue in Kansas, and if so, whether its existing scheduled and contract rates should be modified. In the commission's memorandum opinion of October 6, 1954, it was stated: "The question is solely how much and upon what basis." The order of October 6, 1954, was an approval of the new schedules of rates and classifications whenever filed by Kansas-Nebraska, and the action taken by the commission on October 8, 1954, was immaterial for the purpose of reviewing the basic order of October 6, 1954.

Furthermore, for the reasons discussed below, the commission's action in abrogating Central's contract rates was ineffective and void whether that action be treated as resulting from the October 6, or October 8, orders inasmuch as the commission in neither order made a finding of or inquiry into the reasonableness of the existing contract rates then in effect between Kansas-Nebraska and Central.

The district court found that the order of October 6, 1954, was not unlawful and we need only be concerned with the correctness of the court's conclusion that the order was unreasonable as applied to Central. As previously indicated, this conclusion was based upon the absence of an express finding by the commission that the contract rates between Kansas-Nebraska and Central were unjust, invalid, or unreasonable. Kansas-Nebraska seeks to avoid this conclusion by arguing that the commission may abrogate existing contract rates between a public utility and one of its customers by approving new rates proposed by a utility under G. S. 1949, 66-117 without the necessity of an express finding that existing contract rates are unreasonable, and, if a customer desires to challenge the new rates, it must file a complaint with the commission under G. S. 1949, 66-110.

A brief résumé of those statutes will be made. G. S. 1949, 66-110 requires the commission upon complaint, or upon its own initiative, to investigate the rates or schedules of rates. If, after full hearing and investigation, it finds such rates are "unjust, unreasonable, unjustly discriminatory, or unduly preferential" it shall have the power to fix and order such substituted rates as are just and reasonable. G. S. 1949, 66-117 provides when a public utility desires to make any changes in any rates or schedule of charges, it shall file a schedule with the commission showing the changes desired to be made and put in force. "No change shall be made in any rate . . . or schedule of charges . . . without the consent of the commission . . ." and within 30 days after authorization of the changes by the commission, the new rates become effective.

Appellants would have us interpret those statutes as providing two alternative methods for changing existing contract rates between a utility and its customer: first, to follow the procedure of G. S. 1949, 66-117 whereby the public utility unilaterally initiates changes by filing new schedules, and, if the commission consents to the change, they become effective in the same manner as when the public utility files its rates for approval initially under G. S. 1949, 66-107 and 66-108; or second, to proceed under G. S. 1949, 66-110 where the commission investigates *existing* rates, either upon complaint, or upon its own initiative, and orders changes to be made upon a finding that the rates in effect are "unjust, unreasonable, unjustly discriminatory, or unduly preferential." Under this interpretation, the commission's investigation and findings would differ according to who was seeking the contract rate change—if the utility itself sought the change, the commission could grant its consent pursuant to G. S. 1949, 66-117 merely by finding that the proposed rates were reasonable; whereas if a customer protested the existing contract rates and sought change, a finding that those rates were unreasonable would be necessary before any change could be made. Similarly, if the utility proceeded under G. S. 1949, 66-117, and the commission consented to the proposed rates, its customer would have no opportunity to show that the existing contract rates were reasonable, but would be relegated to showing that the proposed rates were unreasonable, by a hearing under G. S. 1949, 66-110.

We cannot accept this construction of the statutes. The Kansas

Public Utility Act expressly recognizes that gas sales rates to individual customers may be set by private contract, by providing that such contracts shall be filed for approval by the commission (G. S. 1949, 66-108). The act indicates no purpose to abrogate private rate contracts as such. Indeed, where a contract is filed with the commission under G. S. 1949, 66-108, and the rates prescribed therein go into effect, a presumption of reasonableness of those rates arises when the commission, in the light of its statutory duty (G. S. 1949, 66-110) does not investigate the unreasonableness of the rates prescribed. There is a significant difference between a finding of the unreasonableless of existing contract rates and a finding of the reasonableness of the public utility's proposed rates. In order for the contract rates to be abrogated upon the initiative of the commission, or upon complaint of the customer, the commission is required by G. S. 1949, 66-110 to conduct an investigation and make an express finding of the unreasonableness of the existing rates. The statute (G. S. 1949, 66-117) cannot be read as requiring less when the public utility vendor wishes to change the contract rates. A finding that a contract rate is unreasonable must precede the abrogation of the contract.

The necessity for an express finding of the unreasonableness of existing contract rates as a prerequisite to their abrogation is in recognition of the general rule that the state's power to modify or abrogate private rate contracts is incident to its power to regulate public utilities, the exercise of which is conditioned on the public interest. Absent this public interest, abrogation of contracts may not be effected merely to relieve one or the other of the parties from unprofitable or injudicious undertakings. The rule was clearly stated by this court in *Railroad and Light Co. v. Court of Industrial Relations*, 113 Kan. 217, 214 Pac. 797. In that case new rates filed by the utility, which abrogated existing contract rates, were approved after a hearing and a commission finding that the contract rates were unjust and unreasonable. Plaintiffs' customers sought to enjoin operation of the new rates, contending that the contract rates were not unreasonable. The court, in affirming judgment for the plaintiffs on the ground that the utility's financial showing did not justify abrogation of the contract rates, stated that private rate contracts were protected from abrogation, and said:

". . . Subject to an important exception, which will presently be noted,

the contracts in question were protected from impairment by the federal constitution ( U. S. Const., art. 1, § 10, amendment XIV), and by the Kansas bill of rights, sections 1, 2 and 18, which have been construed to the same general effect. (*Winters v. Myers,* 92 Kan. 414, 421, 140 Pac. 1033; *The State v. Wilson,* 101 Kan. 789, 796, 168 Pac. 679.) The important exception is that if such contracts are prejudicial to or discriminate against the public or otherwise obstruct the state's authority to make laws and regulations reasonably necessary for the general welfare, they are not exempt from governmental control, but may be abrogated, curtailed or nullified through the reserved police power of the state. (Cases cited.) But contracts cannot be waved aside by mere lip service invocation of the police power, "by simply invoking the convenient apologetics of the police power," to use the language of Mr. Justice Holmes, in *Kansas Southern Ry. v. Kaw Valley Dist.,* 233 U. S. 75, 79, 58 L. Ed. 857. *Before a contract can be interfered with through the police power, it must appear that the contract does in some measure affect adversely the welfare of the public."* (l. c. 228, 229.) (Emphasis supplied.)

The necessity of a showing that the existing contract rates *"affect adversely the welfare of the public,"* thus rendering them unlawful or unreasonable, is not limited to contract rate changes in proceedings before the commission under G. S. 1949, 66-110, but must be affirmatively incorporated in commission action to validate its consent to schedules of new rates proposed by a public utility under G. S. 1949, 66-117. G. S. 1949, 66-117 provides that *no* rate change, either initially established by the utility with the commission's consent, or initially arrived at by contract between a public utility and its customer, can be made by the public utility without filing and consent of the commission. However, that statute may not be construed to operate as an exception to the rule announced by this court in *Railroad and Light Co. v. Court of Industrial Relations,* supra, since it is the intervention of the public interest or welfare which justifies, and, at the same time, conditions its lawful exercise. Its provisions were designed to enable the commission to exercise its supervisory and regulatory functions, but it does not purport to prescribe the conditions of valid commission consent to effect a change of contract rates. We hold that where contract rates are sought to be changed by the filing of schedules of new rates under G. S. 1949, 66-117, a duty is imposed on the commission to investigate the existing contract rates. Those rates may be abrogated only upon express finding that they are unreasonable and that they "affect adversely the welfare of the public." Absent such a finding, commission approval of proposed schedules of rate changes cannot and does not abrogate existing contract rates. (*Kaul v.*

*Telephone Co.*, 95 Kan. 1, 147 Pac. 1130; *Railroad and Light Co. v. Court of Industrial Relations,* supra; *Wichita R. R. v. Pub. Util. Comm.,* 260 U. S. 48, 67 L. Ed. 124, 43 S. Ct. 51; *Arkansas Gas Co. v. Railroad Comm.,* 261 U. S. 379, 382, 67 L. Ed. 705, 43 S. Ct. 387; *Georgia Ry. Co. v. Decatur,* 262 U. S. 432, 438, 67 L. Ed. 1065, 43 S. Ct. 613; *F. P. C. v. Sierra Pacific Power Co.,* 350 U. S. 348, 100 L. Ed. 388, 76 S. Ct. 368; *United Gas Co. v. Mobile Gas Corp.,* 350 U. S. 332, 100 L. Ed. 373, 76 S. Ct. 373; *Allen W. Hinkel Dry Goods Co. v. Wichison I. Gas Co.,* 64 F. 2d 881; *Mobile Gas Service Corp. v. Federal Power Commission,* 215 F. 2d 883.)

This construction of the statute is supported by the decision of this court in *Kaul v. Telephone Co.,* supra. In that case customers sought to enjoin defendant telephone company from discontinuing service for failure to pay rates filed with the commission after passage of the Public Utilities Act, 1911. Plaintiff contended it was obligated to pay only the rates set out in a contract entered into by the parties in 1903. This court granted the injunction, and said:

". . . In any event, *rates previously* agreed upon between utilities and patrons will continue in force until the commission has found them to be unreasonable, and has prescribed other rates. . . ." (l. c. 4.) (Emphasis supplied.)

In *Railroad and Light Co. v. Court of Industrial Relations,* supra, defendants maintained that the proceedings for rate change were brought under G. S. 1949, 66-117, and that where new rates were filed by the utility under that section they automatically went into effect to nullify the customer's contracts, with no other opportunity to contest them than by institution of proceedings before the commission for a reduction of rates, under G. S. 1949, 66-110. This court dismissed the contention, declaring:

". . . This is manifestly an erroneous interpretation of the statute. The rights of the (customer), the rights of any person in any case, cannot be so easily circumvented. . . ." (l. c. 237, 238.)

In *Wichita R. R. v. Pub. Util. Comm.,* supra, the Supreme Court of the United States was called upon to construe these sections of the Kansas Public Utility Act, in a case arising under its diversity of citizenship jurisdiction. In denying a similar contention of the defendant, the court declared:

". . . (G. S. 1949, 66-117) shows that the filing of a schedule of changed rates under that section cannot accomplish the result of abrogating contract rates. It could not do so any more than would the original filing of a schedule of rates under (G. S. 1949, 66-108) requiring every public utility

to publish and file with the Commission all schedules of rates do this. . . ." (p. 56.)

While this construction of the Kansas act is not binding on this court, its reasoning is persuasive.

The requirement of an express finding of unreasonableness of the existing contract rates has strong support in policy, as effecting a workable compromise between contract stability on the one hand, and the public interest in changing contracts when their rates become unreasonable on the other. In *United Gas Co. v. Mobile Gas Corp.*, supra, where the court adopted an identical construction of the Natural Gas Act, 52 Stat. 821, 15 U. S. C. §§ 717, *et seq.*, a statute strikingly similar to the Kansas act, the court said:

". . . By preserving the integrity of contracts, (this construction of the statute) permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. Conversion by consumers, particularly industrial users, to the use of natural gas may frequently require substantial investments which the consumer would be unwilling to make without long-term commitments from the distributor, and the distributor can hardly make such commitments if its supply contracts are subject to unilateral change by the natural gas company whenever its interests so dictate. . . . On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest." (p. 344.)

The contractual arrangement in the instant case bears out this reasoning. The utilities here involved have operated under the WaKeeney contract and its supplements for a period of more than ten years, which, by their terms, were to remain in effect to September 1, 1959. As previously indicated, the contract was beneficial to each: Central insured itself of a stable long-term supply of gas and acted in reliance on the contract in its planning and setting of rates to its customers, and Kansas-Nebraska was able to construct its second pipe line, thus permitting it to distribute and sell a greater amount of gas from the Hugoton field. The contract itself provided machinery for adjustment in the event of governmental orders increasing the wellhead price, or of increased taxes or labor costs. In addition, the price was voluntarily increased by the second supplemental agreement. Notwithstanding the increased cost of gas to Central, it did not increase its rates to its customers.

Appellants urge that the lack of an express finding of unreasonableness of the existing contract rates is cured by the commission's

order that "as a practical matter . . . Kansas-Nebraska is entitled to additional revenues." They cite *Consolidated Flour Mills Co. v. Kansas Gas and Electric Co.,* 119 Kan. 47, 237 Pac. 1037, in support of their contention. Such a finding of the commission, while it may go to the reasonableness of the *new* rates, implies nothing about the reasonableness or unreasonableness of the contract rates. Although the utility on the over-all scale might require additional revenue, the conditions and terms of a specific contract may not, under scrutiny, prove to be unreasonable. In *Consolidated Flour Mills Co. v. Kansas Gas and Electric Co.,* supra, a customer, some five years after the commission's order, sought to recover the difference between rates it had paid under the order and the lower contract rates paid before the order, on the ground that the order contained no express finding of unreasonableness. Although that opinion contains language which tends to support appellants' contention, its import is that when a commission order is *collaterally attacked* long after it was made and went into effect, a court will not reopen the proceedings, but will presume that facts necessary to support jurisdiction existed, although they did not affirmatively appear in the record.

Other cases cited by appellants are not in point. Specifically, in *City of McPherson v. State Corporation Commission,* 174 Kan. 407, 257 P. 2d 123, contract rates were not involved. The rates there sought to be changed by the filing of new schedules under G. S. 1949, 66-117, were rates originally arrived at unilaterally by the utility and filed with the commission.

It is argued that our holding in the instant case will result in apportionment of the additional revenue allowed Kansas-Nebraska from Central among Kansas-Nebraska's other customers, thus resulting in an unfair and unreasonable burden on them. That result does not follow. G. S. 1949, 66-118k provides that when an order of the commission is vacated or set aside in whole or in part by a district court on review, it shall make findings of fact and conclusions of law, which shall be certified to the commission, and if any charge or classification shall be set aside, it shall be the duty of the public utility affected by the judgment to initiate and file a new rate, charge or classification and the commission may approve it or set it aside.

So far as here concerned, the district court complied with the mandate of the statute and made findings of fact and conclusions

of law that the commission's orders of October 6, 1954, and October 25, 1954, were unreasonable as applied to Central. The finding was clearly supported by substantial competent evidence and fully justified under the record. Other findings of the district court concerned matters not considered by the commission, therefore, it did not have jurisdiction to review them (*City of McPherson v. State Corporation Commission,* supra, p. 413).

The district court properly concluded that the commission's orders of October 6, 1954, and October 25, 1954, were unreasonable as applied to Central. Since those orders were made without an express finding by the commission that the existing contract rates between Kansas-Nebraska and Central were unreasonable, their effect was to abrogate the contract rates, and the district court correctly entered its order as of December 15, 1954, staying them.

The judgment is affirmed.