No. 44,691

THE KANSAS POWER AND LIGHT COMPANY, *Appellee,* v. MOBIL OIL COMPANY and CITIES SERVICE OIL COMPANY, *Appellants.*

(426 P. 2d 60)

Opinion filed April 8, 1967.

*Richard Jones,* of Wichita, argued the cause, and *W. R. Harrison,* of Denver, Colorado, and *Gentry Lee, Cecil C. Cammack, Alfred O. Holl,* and *George Conger,* all of Bartlesville, Oklahoma, were with him on the brief for the appellants.

*James L. Grimes, Jr.,* of Topeka, argued the cause, and *Robert L. Webb, Ralph W. Oman, Philip E. Buzick, William B. McElhenny, James D. Waugh, Donald J. Horttor, Terry L. Bullock, Stewart L. Entz,* and *James E. Smith,* all of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This appeal grows out of an action commenced by the Kansas Power and Light Company, the plaintiff and appellee in this case, to collect deficiency charges for transporting natural gas produced from wells owned by Mobil Oil Company and Cities Service Oil Company, the defendants and appellants herein. Summary judgment was entered for the plaintiff, and the defendants have appealed. For convenience, the parties will be designated as plaintiff, or KPL, on one side, and as defendants, or Mobil and Cities Service, on the other.

From the record we glean the following facts: In January, 1956, the parties executed a twenty-year contract in which plaintiff agreed to buy certain quantities of natural gas from Mobil's predecessor, and from Cities Service (similar contracts being made between KPL and other producers in the Spivey-Grabs Field in Kingman County). The contracting parties recognized that the future production of gas from that field might exceed KPL's needs and accordingly they agreed that if, at the end of five years, excess gas was being produced from the defendants' wells, KPL would release such gas to the defendants and would transport it to a processing plant at a reasonable cost to be negotiated by the parties. The contract contained a further provision requiring arbitration on matters on which the parties were unable to agree.

As had been contemplated, excess gas was produced from the defendants' wells (as was true with other wells in the field) and a supplemental agreement was made in 1961 under which KPL was to transport the defendants' gas to Anadarko. No agreement could be reached as to the reasonable cost of transportation and the parties agreed to waive arbitration of that matter and to submit this question to the State Corporation Commission of Kansas in proceedings which KPL agreed to initiate within a reasonable time. It was agreed that an interim charge of 3.5¢ per MCF would be made, but that whatever charge the Commission should find to be reasonable was to relate back to gas already delivered.

KPL did not initiate proceedings before the Commission, as it

had agreed, but instead filed a schedule, hereafter referred to as Trans No. 1, setting up a charge of 3.79¢ per MCF plus a deficiency charge of like amount in the event total deliveries from the defendants fell below a certain volume. Upon learning of this action, the defendants, apparently in conjunction with other producers in the same field, initiated proceedings themselves to have the Commission determine the reasonable cost of gathering and transporting their excess gas.

Assuming jurisdiction, the Commission set the matter for hearing and conducted a thorough investigation, hearing extensive testimony and considering a diversity of factors. On October 18, 1962, the Commission filed its order, in which it found the reasonable cost of gathering and transporting the defendants' excess gas was 2.5¢ per MCF and that the charge then on file, or then being made, was not a reasonable charge for such services. The Commission concluded by ordering KPL to file and put into effect, within thirty (30) days, the 2.5¢ per MCF rate and to refund the amount of all overcharges. Copies of this order were furnished all parties.

In response to this order the plaintiff, on November 21, 1962 filed a second schedule, designated as Trans No. 2, setting out the 2.5¢ per MCF transportation charge and, in addition, listing a deficiency charge of like amount. Minutes of the Commission for that date read that it was "moved and carried" that this filing, among others, "be noted and filed." The record does not show that copies of Trans No. 2 were furnished to Mobil or to Cities Service.

Matters seemed to have gone along smoothly until, on December 20, 1963, KPL sent statements to the defendants claiming amounts due for deficiencies occurring during the year August 27, 1962 to August 27, 1963. So far as the record reveals, and for that matter, so far as the plaintiff contends, this was the first actual notice either Mobil or Cities Service had of the deficiency charge provision included in Trans No. 2. Correspondence then passed between the parties, in which each defendant denied owing KPL any amount whatever. Eventually this suit was filed to recover the indebtedness allegely due from each defendant.

The conflicting theories of the parties may be summarized briefly: The plaintiff contends that once Trans No. 2 was filed by the Commission, the charges set forth in that document became the legal rates to be charged and that, by statutory mandate, KPL

was required to collect such charges until the same might be changed by Commission order.

In opposition, the defendants assert that once the Commission found the reasonable cost of transporting their excess gas to be 2.5¢ per MCF, that cost became the contract rate and that, under their agreements with the plaintiff, KPL was bound by the 2.5¢ MCF rate and could not charge or collect a higher price until that rate was legally changed by the Commission.

We agree with the rationale underlying the defendants' position. Very simply, our view is this: KPL agreed, in a written contract whose validity is not disputed, to transport excess gas produced from the defendants' wells at a reasonable cost, such cost to be determined by the Kansas State Corporation Commission; after comprehensive investigation the Commission found the reasonable cost to be 2.5¢ per MCF and ordered KPL to put that rate into effect and to refund overcharges; and that by virtue of the Commission's finding that 2.5¢ per MCF was the reasonable transportation cost, that figure became the contract rate.

It is an ancient legal maxim that contracts freely and fairly made are favorites of the law. This, we believe, is as true in the field of public utilities as it is elsewhere. Many years ago, the right of public utilities and common carriers to enter into contracts for the sale of their services was expressly recognized by statute, and today K. S. A. 66-108 requires that *all contracts* between common carriers or public utilities, pertaining to services to be rendered by them, be filed with the State Corporation Commission.

The right of public utilities to negotiate private contracts with their customers was accorded judicial recognition in *Central Kansas Power Co. v. State Corporation Commission,* 181 Kan. 817, 316 P. 2d 277, where this court said:

"The Kansas Public Utility Act expressly recognizes that gas sales rates to individual customers may be set by private contract, by providing that such contracts shall be filed for approval by the commission (G. S. 1949, 66-108). The act indicates no purpose to abrogate private rate contracts as such. (pp. 826-827.)

Because of the public interest with which the business of common carriers and public utilities is affected, private contracts negotiated by them, it is true, are subject to curtailment, or even to abrogation, through the medium of the exercise of the state's police power, provided the public welfare is being adversely affected by such contracts. (*Railroad and Light Co. v. Court of Industrial*

*Relations,* 113 Kan. 217, 214 Pac. 797; *Central Kansas Power Co. v. State Corporation Commission,* supra.) However, this court said in *Railroad and Light Co. v. Court of Industrial Relations,* supra:

"But contracts cannot be waved aside by mere lip service invocation of the police power, 'by simply invoking the convenient apologetics of the police power,' to use the language of Mr. Justice Holmes, in *Kansas Southern Ry. v. Kaw Valley Dist.,* 233 U. S. 75, 79, 58 L. Ed. 857. Before a contract can be interfered with through the police power, it must appear that the contract does in some measure affect adversely the welfare of the public." (p. 229.)

Once the Commission determined that the reasonable cost of gathering and transporting the defendants' excess gas was 2.5¢ per MCF and ordered that this rate be filed, that rate, as we have said before, became the contract rate. Being the rate fixed by contract, it was not subject to change except upon a finding made by the Commission that the same was unreasonable. Such is the express holding of this court in the *Central Kansas Power Co.* case, *supra.*

That case arose from an order of the Kansas Corporation Commission, which was entered after hearing an application filed by the Kansas-Nebraska National Gas Company, pursuant to K. S. A. 66-117, seeking an increase in rates. The order made by the Commission granted a general increase in rates, including rates which had been fixed in private contracts filed with the Commission. However, the Commission made no finding that the rates set by such contracts were unreasonable or that they were harmful to the public interest. This court held that existing contract rates could not be abrogated by order of the Commission, acting either on its own initiative, or on a complaint, or simply on the filing of a new schedule, unless there was an express finding that existing rates were unreasonable or damaging to the public.

In filing Trans No. 2, the plaintiff was not, in fact, complying with the order made by the Commission on October 18, 1962, but was filing a different schedule—a schedule which departed both from the findings and from the order entered by the Commission, by adding a new dimension, *i. e.,* a deficiency charge. But, it is argued, the Commission accepted and approved Trans No. 2, thereby breathing life and legality into its schedule of charges, including the added deficiency charge. If we assume the Commission, by its order "noting and filing" Trans No. 2, thereby approved the schedule as changed from the Commissioner's former order, and such is the tenor of an affidavit signed by one of its employees, that approval

was not valid because there was no finding that the reasonable cost determined by the Commission less than thirty days before had, in the meantime, become unreasonable.

It is true that K. S. A. 66-117 provides that whenever a public utility desires to make any charge in a rate or charge, it shall file a schedule with the Commission showing the desired change, but no change shall be made without the Commission's consent. This statute does not mean, however, that Commission consent may be given, at least where private contract rates are concerned, by desultory action or routine approval; it can be given only after investigation and upon a finding of unreasonableness.

A similar situation was thoroughly canvassed by this court in the *Central Kansas Power* case, where we said:

"We hold that where contract rates are sought to be changed by the filing of schedules of new rates under G. S. 1949, 66-117, a duty is imposed on the commission to investigate the existing contract rates. Those rates may be abrogated only upon express finding that they are unreasonable and that they 'affect adversely the welfare of the public.' Absent such a finding, commission approval of proposed schedules of rate changes cannot and does not abrogate existing contract rates." (p. 828.)

We believe that application of this principle to the circumstances of the present case is not only legally required, but is equitable as well. Twice, KPL has filed schedules under somewhat unusual circumstances; first, after it had agreed, but failed, to initiate proceedings before the State Corporation Commission to determine the reasonable cost of gathering and delivering the defendants' excess gas, and second, after the reasonable cost had been determined by the Commission, by then filing a schedule which deviated from the Commision's order, copies of which were not furnished to the defendants, at least until after indebtedness accrued under the altered schedule.

In view of the foregoing facts, we think it comes with poor grace for plaintiff to contend that it was the defendants' obligation to attack Trans No. 2 if they disliked the charges there set forth. Of course, the very converse is true; it was the plaintiff's place to object to the findings and order of the Commission, if it felt them unfair. Had this been done, the defendants would have had an opportunity to defend the Commission's findings and order.

Counsel for plaintiff cite us to legal authority (*Columbia Fuel Corp. v. Panhandle Eastern Pipe Line Co.*, 176 Kan. 433, 271 P. 2d 773) that an interpretation by an administrative body of its order

is entitled to great weight in construing the meaning and effect of the order. This citation is called to our attention in connection with the plaintiff's claim that the Commission had *approved* Trans No. 2.

Assuming, again, that the Commission's acceptance of the filing of Trans No. 2 constituted its approval thereof, there are at least two reasons why the citation is inapposite. First, we believe the rule can be pertinent only when the Commission's order is ambiguous. When an order is clear and not susceptible to more than one interpretation, as we believe the Commission's order is, there can be no reason for interpretative aids. In the second place, as we have already said, administrative approval would be without legal effect in this case because no investigation was conducted and no finding made that the existing rate was unreasonable or adverse to the public interest.

One further comment may be justified concerning an additional contention advanced by the plaintiff. It is maintained that under the holding in *Kansas Electric Power v. Thomas,* 123 Kan. 321, 255 Pac. 33, the plaintiff was required by law to collect the charges set out in Trans No. 2. This argument assumes, of course, that the schedule of charges set out in Trans No. 2 was the lawfully filed and published tariff: Since we hold that Trans No. 2 did not effect a unilateral abrogation of the contract rate, this argument is founded upon the sands and must fall of its own weight.

The defendants have somewhat sketchily briefed a point on unjust enrichment. In view of our conclusion that this case must be reversed, discussion of that issue would be entirely superfluous.

The judgment of the court below is reversed with directions to enter judgment in favor of the defendants.

KAUL, J. (dissenting): In my view the questions in this case are simply whether or not Trans No. 2 was properly filed and publicized as a tariff schedule and if so could it be challenged by way of defense in an action to collect charges pursuant to the rates scheduled therein. Undoubtedly the trial court would not have entered a summary judgment if a question of fact, so fundamental as whether or not Trans No. 2 had been approved, was still unresolved. The attitude of the trial court is apparent from the extended colloquy between court and counsel on this point. The colloquy culminated in the following:

"THE COURT: That isn't the question. I'm asking if it is true, let's admit

it, if it isn't let's get over that hump first, now. Do you concede that all of the legal requirements were complied with and that the State Corporation Commission, acting as a commission, approved the tariff Trans No. 2, accepted it, approved it, and ordered that it be filed?

Mr. Jones: I think we would have to accept Mr. — of course, my colleagues and I have some question as to whether it was really taken to a conference. So far as their mechanics are concerned I would say, yes, it was filed, accepted and approved."

Once Trans No. 2 became the filed and published schedule of rates, the appellee as a matter of law was required to charge those rates under the mandatory provisions of K. S. A. 66-109.

I think the trial court defined the issue and then correctly resolved it in the following succinct statement quoted from its memorandum opinion:

". . . If the defendants deemed themselves entitled to relief from this rate they were obligated to complain by invoking the relief provided by the public utilities act before the State Corporation Commission before resorting to this court. This court is bound by the schedule of rates filed in accordance with the statute until changed by act and order of the Corporation Commission."

In my judgment this case does not involve the abrogation of contract rates. Unlike the contract in *Central Kansas Power Co. v. State Corporation Commission,* 181 Kan. 817, 316 P. 2d 277, no agreement was made between the parties here as to the charges for transportation. Here, by the terms of the agreement, the commission was to make the rates. Therefore, in my opinion, the rule, correctly stated in *Central Kansas Power Co.,* that contract rates cannot be abrogated by the commission absent an express finding of unreasonableness does not apply.

In my view the position taken by the appellants in their defense amounts to an attempt to secure a collateral review of rates filed and published by the State Corporation Commission pursuant to K. S. A. 66-108. It is a well-established principle in this jurisdiction that parties who complain that a public utility has failed to furnish adequate service or has charged excessive rates should invoke the relief provided by the public utilities act. (See *Denison Mutual Telephone Co. v. Kendall,* 195 Kan. 227, 403 P. 1011, and cases cited therein.) In my judgment the defense in this lawsuit is an attempt to circumvent the statutory, original jurisdiction of the State Corporation Commission under the act. I would affirm the judgment, therefore I respectfully dissent.

Price, C. J., joins in the foregoing dissenting opinion.