(971 P.2d 1213)
No. 82,055

FARMLAND INDUSTRIES, INC., *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee.* WESTERN RESOURCES, INC., KANSAS GAS AND ELECTRIC COMPANY, CITIZENS' UTILITY RATEPAYER BOARD, and CITY OF WICHITA, *Intervenors.*

 Opinion filed January 28, 1999. 

*James P. Zakoura* and *David J. Roberts*, of Smithyman & Zakoura, Chartered, of Overland Park, and *Edmund S. Gross*, of Farmland Industries, Inc., of Kansas City, Missouri, for appellant.

*John J. McNish*, advisory counsel, *Glenda Cafer*, general counsel, and *Paula Lentz*, assistant general counsel, of the Kansas Corporation Commission, for appellee.

*Martin J. Bregman*, of Western Resources, Inc., of Topeka, for intervenors Western Resources, Inc., and Kansas Gas and Electric Company.

*Walker Hendrix* and *A. Brady Cantrell*, of Citizens' Utility Ratepayer Board, of Topeka, for intervenor Citizens' Utility Ratepayer Board.

*Gary E. Rebenstorf*, city attorney, and *Joe Allen Lang*, first assistant city attorney, and *Gregg D. Ottinger*, of Duncan & Allen, of Washington, D.C., for intervenor City of Wichita.

Before GREEN, P.J., ELLIOTT, J., and WAHL, S.J.

GREEN, J.: This case involves a petition for judicial review by Farmland Industries, Inc. (Farmland). Farmland challenges the Kansas Corporation Commission's (KCC) approval of a rate design settlement. We affirm.

The public utilities Kansas Gas and Electric Company (KGE) and Kansas Power and Light Company (KPL) are owned by Western Resources, Inc. (WRI). In January 1997, the KCC approved a nonunanimous settlement which reduced KGE's rates by $65 million and KPL's rates by $10 million. The KCC also adopted the WRI/KCC Staff rate design proposal. Under the settlement, special contract customers were ineligible for a rate reduction.

In *Farmland Industries, Inc. v. Kansas Corporation Comm'n,* 24 Kan. App. 2d 172, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997) (*Farmland I*), this court affirmed the KCC's decision to approve the nonunanimous settlement and to use a combined cost-of-service study for the purpose of achieving closer parity between the rates of KGE and KPL. We, however, disapproved the rate design, determining that the rate design was not supported by substantial competent evidence. 24 Kan. App. 2d at 202. We remanded for further proceedings on this issue.

On remand, rate design proposals were submitted by the following parties: Farmland, Kansas Industrial Consumers (KIC), Citizens' Utility Ratepayer Board (CURB), KCC's Staff (Staff), and WRI. After hearings, the KCC adopted the WRI/Staff rate design as a compromise of competing interests.

*Standard of Review*

A party challenging the validity of an agency action has the burden of proving its invalidity. K.S.A. 77-621(a)(1). The standards of judicial review used in evaluating an agency action are defined in K.S.A. 77-621(c). This court shall grant relief only if it determines any one or more of the following standards is applicable:

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

Briefly summarizing the scope of appellate review, our Supreme Court in *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988), stated:

"If KCC action is constitutionally authorized by statute, it is presumed valid on review unless it is not supported by substantial competent evidence and is so wide of its mark as to be outside the realm of fair debate, or is otherwise unreasonable, arbitrary, or capricious and prejudices the parties."

Regarding the KCC's role in setting utility rates, in *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 720 P.2d 1063 (1986), the court pointed out that the KCC must be afforded wide discretion in choosing its methodology to approach the complex problems it faces. A public utility is not bound to use any one particular formula or method in valuing a public utility's property for rate-making purposes. Instead, the KCC should receive and consider all evidence relevant to determining a reasonable value and then decide what formula, or combination of for-

mulae, should be used under the facts and circumstances of the case. 239 Kan. at 495-96.

In determining whether the KCC erred in interpreting or applying the law, K.S.A. 77-621(c)(4), this court will need to consider questions of law. An appellate court has unlimited review of a question of law. *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 283, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

To assure the KCC has engaged in lawful procedures and followed prescribed procedures, K.S.A. 77-621(c)(5), the KCC must render a written decision that is concise and contains a specific statement of relevant law and basic facts that support the decision. The KCC is not required to state factual findings in minute detail, but must be specific enough to allow judicial review of the reasonableness of the order. To guard against arbitrary action, conclusions of law must be supported by findings of fact supported by evidence in the record. *Zinke*, 242 Kan. at 475.

To determine whether the KCC's action is supported by substantial evidence, K.S.A. 77-621(c)(7), the record must contain evidence "which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved." *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 44, 46, 602 P.2d 131 (1979), *rev. denied* 227 Kan. 927 (1980).

The KCC action cannot be unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c)(8). The Kansas Supreme Court has defined unreasonable action as action taken without regard to the benefit or harm of all interested parties. An agency's action is arbitrary and capricious if it is unreasonable or without foundation in fact. *Zinke*, 242 Kan. at 474-75.

Finally, in reviewing an agency order, a court must give due account to the harmless error rule. K.S.A. 77-621(d). If the agency error did not prejudice the parties, the agency's action must be affirmed. *Zinke*, 242 Kan. at 475. With the standards of review in mind, we turn to the substantive issues.

First, Farmland argues that the KCC erred in determining that Farmland and other special contract customers were ineligible to

participate in the rate reduction. Further, Farmland contests the KCC's conclusion that it is not a captive customer to the KGE system. It argues these special contracts do not arise from arms-length negotiations because WRI has a retail electric monopoly that provides exclusive service within its electric service territory. See K.S.A. 66-1,171 *et seq*.

On the other hand, the KCC maintains that once a private contract has been approved, the contract can be set aside or otherwise interfered with only if the KCC finds the contract is unreasonable and is adversely affecting public welfare. In *Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 559, 426 P.2d 60 (1967), the court pointed out that contracts freely and fairly made, including those made in the field of public utilities, are favorites of the law. Contracts negotiated by public utilities are subject to curtailment, even to the point of abrogation, by exercise of the State's police power if the contract in some measure adversely affects public welfare. 198 Kan. at 559.

The KCC properly determined that Farmland and other special contract customers were not a class of customers eligible to participate in the KGE rate reductions. First, the contracts are individually negotiated based upon the value of the electric service provided to each customer rather than the cost to serve a particular customer class. Second, although the electric company may have a monopoly over the service territory, the negotiations were between two sophisticated business parties and were initiated by Farmland. Third, the KCC honors these contracts unless adverse to public welfare. Fourth, Farmland's special contract is not tied to other tariffs and, thus, it would not share in the reductions; however, it also did not risk an increase in price. Fifth, the evidence establishes that the Farmland special contracts negotiated in 1992 and 1995 provide a reduced rate below those available under normal KGE tariffs. Sixth, the history of the two companies explains why the KPL tariffs, including the Large Tire Manufacturer tariff used by one customer, are less expensive than the KGE special contracts. KGE customers' rates have been higher because they are served by the Wolf Creek Nuclear Power Plant, which cost $3 billion to build by the time it was completed in the mid-1980s.

Finally, reducing rates to other customers without including special contract customers does not violate public policy and does not require that the Farmland contract be abrogated.

As a result, the KCC did not erroneously apply or interpret the law and did not engage in an unlawful procedure in refusing to set aside Farmland's special contract because it did not adversely affect public welfare. See K.S.A. 77-621(c)(4) and (5). The KCC's refusal to treat special contract customers as a class eligible to participate in rate reductions was supported by substantial evidence. See K.S.A. 77-621(c)(7). Refusal by the KCC to treat the special contract customers as a class was not unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c)(8).

Next, Farmland argues that the KCC adopted the wrong rate design proposal. In support of this argument, Farmland maintains that the KCC was required to use a combined cost of service to establish the rate design in this case. We disagree.

In *Farmland I*, we determined that the WRI/Staff rate design proposal approved by the KCC was unsupported by substantial competent evidence and remanded for further proceedings on rate design issues. 24 Kan. App. 2d at 202. On remand, the parties presented extensive prefiled testimony regarding rate design. An evidentiary hearing was held on April 7, 1998. Expert testimony was presented by WRI, Staff, Farmland, CURB, and KIC.

WRI and Staff offered their earlier proposal to allocate one-third of the total rate reductions to the residential class of customers and spread the remaining two-thirds among various commercial and industrial class customers. No rate reductions were allocated to special contract customers or to customers taking service under the space heating tariff.

Farmland specifies several challenges to evidence presented to the KCC to support the WRI/Staff rate design proposal. Farmland's first argument concerns the scope of cost-of-service studies. When it set revenue requirements, the KCC used combined cost-of-service values for KGE and KPL and used an integrated approach to evaluate the need for rate reductions in these companies. After KGE and KPL merged, WRI continued to treat these companies separately. In *Farmland I*, we determined that WRI's efforts

to maintain separate subdivisions should not prevent the KCC from exercising its discretion to evaluate the two electric utility subdivisions of WRI on a combined cost-of-service basis. 24 Kan. App. 2d at 192. We approved not only the $75 million rate reduction, but also its allocation of $65 million of the reduction to KGE customers and $10 million of the reduction to KPL customers. 24 Kan. App. 2d at 195-96.

On remand, Farmland utilized a combined cost-of-service study to justify its rate design proposal, which recommended that rates for all special contract customers be reduced or, alternatively, that rates for Farmland be reduced on an individual basis due to Farmland's significant contribution to the WRI system. The four other cost-of-service studies presented to the KCC evaluate the companies as separate entities. Because the combined cost-of-service study was relied upon by the KCC and approved by this court in *Farmland I,* Farmland urges this same method be required in establishing the rate design. Farmland asserts reliance upon invalid separate cost-of-service studies renders the KCC approval of the proposed rate design contrary to the law, unsupported by substantial evidence, and unreasonable, arbitrary, and capricious. See K.S.A. 77-621(c)(4), (7), and (8).

In addition, Farmland challenges the validity of cost-of-service studies by WRI, Staff, and CURB because they relied upon WRI's presettlement rate base rather than making an adjustment after the rate reduction was approved, which causes inflation of the rate base and makes the studies unreliable. Nevertheless, in reviewing testimony from the experts on various cost-of-service studies, it becomes clear these studies are not an exact science. No universal agreement exists about a correct method to use. The studies are a tool the KCC can use to help it set fair rates. During the proceeding, several experts found errors in their respective cost-of-service studies, leading them to make multiple revisions. The KCC recognized the limits of the cost-of-service studies and considered each of them in reaching its decision to approve the WRI/Staff proposed rate design.

Also, Farmland complains that the KCC improperly considered revenues received outside the test year for the cost-of-service stud-

ies. When WRI's expert calculated Farmland's revenue for the test year, rates for the 1995 special contract were used with the load from.the test year. WRI's expert testified he made this adjustment because using the 1992 contract rates would not accurately reflect Farmland's current expense based on cheaper rates in the 1995 contract. On the other hand, Farmland argues that these adjustments were inappropriate because the adjustments failed to account for increased load and associated changes in costs contained in the 1995 contract. Also, the KCC relied upon Staff's cost-of-service study that did not adjust for the 1995.revenues. As a result, Farmland argues that the KCC's finding that Farmland failed to account for revenue under the 1995 contract in its cost-of-service study, and thus overstated the rate of return, is unlawful, unsupported by substantial evidence, and unreasonable, arbitrary, and capricious. See K.S.A. 77-621(c)(4), (5), (7), and (8).

Finally, Farmland's expert testified WRI erred in including costs associated with the distribution system that delivers electricity in calculating expenses incurred by WRI on behalf of special contract customers and particularly Farmland. Although Farmland has a transformation facility, the record shows that the power Farmland receives into its transformer has already been stepped down in part by WRI transformation facilities. Therefore, WRI argued it was error for Farmland's expert to remove all distribution expenses for special contract customers from its cost-of-service study.

The legislature has given the KCC wide discretion, and its findings have a presumption of validity on review. The KCC's decisions involve the difficult problems of policy, accounting, economics, and other special knowledge that go into setting utility rates. The KCC is aided by a staff with experience as statisticians, accountants, and engineers. A court may not set aside an order of the KCC merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. Only when the KCC's determination is outside the realm of fair debate can a court nullify it. *Midwest Gas Users Ass'n v. Kansas Corporation Commission*, 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

The KCC reviewed each of the cost-of-service studies presented. The KCC noted competing methodologies allocate costs differently

among customer groups and recognized rate design is not an exact science. The KCC discussed each class cost-of-service study presented and reviewed the allocation method utilized, the rates of return determined, and the expert's resulting recommendations. Also, the KCC reviewed KIC's and CURB's critiques of cost-of-service studies conducted by Staff and WRI.

After reviewing the evidence, the KCC concluded the rate design proposal submitted by Staff and WRI was a reasonable compromise of competing interests. Testimony supporting the rate design for the KPL system was uncontroverted. On remand, class cost-of-service studies show the rate of return associated with the general service tariff customers for both KPL and KGE systems will be reduced using the rate design adopted. Furthermore, allocation of reductions will reduce the disparity between KPL and KGE rates by putting more reduction where the disparity is greatest. Also, assigning two-thirds of the reduction to industrial classes and one-third to residential classes will provide more relief to those classes whose rate of return is above the system average.

The rate design chosen takes reasonable steps to reduce rate disparities between customer classes in the KPL system and in the KGE system. Regardless of which methodology is used, the rate design reflects cost-of-service factors and aligns rates consistent with those factors. It benefits all tariff customer classes and no customer's rates are increased. Although rate reductions were not allocated evenly, the reductions were assigned where disparity was greatest. The rate design moves toward eliminating the existing class cost-of-service differences, regardless of which figure is used as the rate base, while recognizing existing disparities. The KCC has chosen to move gradually to eliminate these disparities.

The KCC is to receive and to consider all evidence relevant to determining the reasonable value of a company's property and then decide which formula to use under the facts and circumstances of the case. *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 65, 386 P.2d 515 (1963). That is what the KCC did here. As a result, the KCC did not erroneously apply the law or engage in an unlawful procedure and did not fail to follow a prescribed procedure in approving the WRI/Staff proposal. See

K.S.A. 77-621(c)(4) and (5). Furthermore, substantial evidence supported the KCC's decision to approve the WRI/Staff proposal on rate design, and the decision was not unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c)(7) and (8).

Next, Farmland argues that it was denied due process. It argues that the KCC permitted WRI to introduce its class cost-of-service studies without requiring WRI to furnish Farmland access either to the computer program which generated the studies, or to the underlying equations.

Farmland requested that WRI provide work papers and a diskette containing the computer programs for its class cost-of-service studies. Farmland assumed it received all WRI's work papers and learned the cost-of-service studies used a computer program from Threshold Associates (Threshold). The Threshold software program performed computations based on input data and generated the schedules included in WRI's rate design studies. Because Threshold had a proprietary interest in the computer program, WRI refused to provide it.

Nevertheless, Dick Rohlfs, WRI's expert, testified he provided Farmland with all data entered into the computer and the output cost-of-service model, which would allow replication by hand without the Threshold program. Also, Farmland could have tested the calculations with a Lotus computer program, such as one used by the KCC Staff. Finally, WRI offered to run Farmland's data in the Threshold computer model to test its reliability. The KCC allowed the evidence, noting Rohlfs' efforts to assist Farmland's expert with the data utilized and calculations as well as the offer to run Farmland's data on the Threshold computer program.

Discussing the degree of due process required in quasi-judicial settings in *Mobil Exploration & Producing U.S. Inc. v. Kansas Corporation Comm'n*, 258 Kan. 796, 821, 908 P.2d 1276 (1995), our Supreme Court stated:

"An administrative body empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of a judicial nature is acting in a quasi-judicial capacity. *Adams v. Marshall*, 212 Kan. 595, 599, 512 P.2d 365 (1973). We have stated that the full rights of due process present in a court of law do not automatically attach to a quasi-judicial hearing. *In re Petition*

*of City of Overland Park for Annexation of Land,* 241 Kan. 365, 370, 736 P.2d 923 (1987). However, we have also held that '[t]he right to the cross-examination of witnesses in quasi-judicial or adjudicatory proceedings is one of fundamental importance and is generally, if not universally, recognized as an important requirement of due process.' *Adams v. Marshall,* 212 Kan. at 599-600. See *Wulf-kuhle v. Kansas Dept. of Revenue,* 234 Kan. 241, 246, 671 P.2d 547 (1983) (holding that the right to cross-examine witnesses testifying at administrative hearings of a 'quasi-judicial' character is an important requirement of due process)."

Because the right to cross-examine witnesses and to challenge the introduction of evidence are such important due process functions, we must determine whether the computer program and its core code are essential pieces of information in this case.

We recently reviewed a KCC decision to withhold from CURB proprietary cost data in a proceeding to establish a cost methodology to assist in setting prices a telephone monopoly may charge its competitors. *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n,* 24 Kan. App. 2d 63, 941 P.2d 424 (1997). The KCC justified its ruling by asserting its power to limit an intervenor's participation under K.S.A. 77-521. We considered whether the KCC had erroneously interpreted or applied the law or whether its protective order was otherwise unreasonable, arbitrary, or capricious under K.S.A. 77-621(c)(4) and (8). We concluded that nothing in the record warranted depriving CURB of information available to other parties to the proceedings. 24 Kan. App. 2d at 69. We, therefore, determined that the KCC's decision was unreasonable, arbitrary, and capricious. 24 Kan. App. 2d at 71.

The facts here can be distinguished. Farmland was provided the data utilized and WRI's cost-of-service model. The KCC Staff used this information to develop its cost-of-service study. WRI was cooperative in the discovery process and made available all of the necessary information which was entered into the computer program. The computer program was not essential for doing a rate design study because the KCC Staff tested its calculations on a Lotus program. As a result, the admission of the WRI cost-of-service study was not improper and was not unreasonable, arbitrary, or capricious. See K.S.A. 77-621(c)(4) and (8).

Next, Farmland argues that the KCC erred in making the rate design retroactive to February 1, 1997. When the KCC adopted

the WRI/Staff rate design proposal, it stated the order would be effective as of February 1, 1997. Farmland argues rates approved by an order entered July 24, 1998, based upon evidence received April 7, 1998, cannot become effective February 1, 1997.

In *Farmland I*, we reversed the KCC's order regarding rate design because it was not supported by substantial evidence. 24 Kan. App. 2d at 202. Citing *Farmland I*, 24 Kan. App. 2d at 199-202, and *Midwest Gas Users Ass'n*, 3 Kan. App. 2d at 380-81, Farmland argues that an order not supported by substantial competent evidence is unreasonable and unlawful. *Cf. Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, 397, 565 P.2d 597 (1977) (order based on substantial competent evidence will generally be considered reasonable); *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 506, 561 P.2d 779 (1977) (court determines if KCC order is unlawful or unreasonable). A KCC order determined unlawful by the appellate courts is unlawful from the date it was authorized. *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, Syl. ¶ 9, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997).

When the court sets aside a charge or practice, the public utility must initiate and file a new rate or charge. K.S.A. 66-118k. Because WRI did not file a new rate or charge, Farmland argues the rates in effect from February 1, 1997, through July 24, 1998, were collected under an invalid rate design order and this portion of the order must be reversed. Nevertheless, a rate does not become final until the appellate process is over. 24 Kan. App. 2d at 57.

Here, rate reductions were allocated according to the initial rate design proposal the KCC ordered to become effective as of February 1, 1997. While on appeal, we held that the design plan was not supported by substantial evidence. The corresponding rates did not become final because the appellate process was not completed. When a case is remanded, the KCC has the power, subject to judicial review, to correct errors in the rate-making process without setting retroactive rates.

On remand, the KCC corrected the deficiency found on appeal by receiving substantial evidence to support the rate design it adopted. Although the KCC could have adopted a rate design pro-

posal different than the one initially presented by WRI/Staff, it was not error to adopt the same proposal. The KCC's decision to make the rate design effective as of February 1, 1997, was not unlawful or unreasonable, arbitrary, or capricious under K.S.A. 77-621(c)(5) and (8).

Affirmed.