No. 119,834

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RICHARD L. HANSON, CIRCLE  H FARMS LLC,
ROME FARMS LLC, STEGMAN FARMS PARTNERSHIP,
*Appellees*,

v.

KANSAS CORPORATION COMMISSION,
*Respondent*,

and

TEXAS-KANSAS-OKLAHOMA GAS, LLC,
*Appellant*.

SYLLABUS BY THE COURT

1.

In an appeal from an administrative decision under the Kansas Judicial Review Act, appellate courts exercise the same statutorily limited review of the agency action as the trial court—as though the appeal had been made directly to the appellate court. The burden of proving the agency's decision was erroneous lies with the party asserting the error.

2.

Kansas law gives the Kansas Corporation Commission full power, authority, and jurisdiction to supervise and control natural gas public utilities in this state, empowering the Commission to do all things necessary to carry out this responsibility.

1

3.

Although the Kansas Corporation Commission is charged with interpreting and applying the statutes governing its authority, Kansas courts give no deference to agencies' interpretation of statutory language. Instead, statutory interpretation is a quintessentially legal question over which appellate courts' review is unlimited. A claim under K.S.A. 77-621(c)(4) that an agency erroneously interpreted and applied the law is reviewed de novo.

4.

The primary aim of statutory interpretation is to give effect to the legislature's intent, expressed through the plain language of a statute. Courts therefore do not add or ignore statutory text, and courts give ordinary words their ordinary meanings.

5.

K.S.A. 66-1,205(a) defines the circumstances under which the Kansas Corporation Commission may review a complaint involving a natural gas public utility's rates, rules, regulations, practices, or acts. The text of K.S.A. 66-1,205(a) does not limit the Commission's regulatory authority to a rate-reviewing function. Instead, it provides the Commission broad authority to determine whether any rule and regulation, practice, or act whatsoever is in any respect unreasonable, unfair, or unjust.

6.

Kansas statutes direct the Kansas Corporation Commission not merely to review the rates charged by natural gas public utilities in this state, but also to oversee the utilities' practices to ensure they are not in any respect unreasonable, unjust, or unfair. If the Commission finds any practice deficient, it may correct the utility's error as it determines to be just, reasonable, and necessary. This authority should be liberally construed so the Commission can carry out its statutory charge.

7.

K.S.A. 66-1,206 vests the Kansas Corporation Commission with authority to craft a remedy when a natural gas public utility's rates or practices are found to be unreasonable, unjust, or unfair. This allows the Commission to investigate potential courses of action—whether some form of refund, rate adjustment, penalty, or other remedy—and determine which is in the best interest of the complainants and the public.

Appeal from Stevens District Court; BRADLEY E. AMBROSIER, judge. Opinion filed April 10, 2020. Affirmed in part, reversed in part, and remanded to the Kansas Corporation Commission with directions.

*Jeremy L. Graber*, *C. Edward Watson II*, and *Daniel J. Buller*, of Foulston Siefkin LLP, of Topeka, for appellant Texas-Kansas-Oklahoma Gas, LLC.

*Lee Thompson*, of Thompson Law Firm, LLC, of Wichita, for appellees.

Before WARNER, P.J., POWELL, J., and LAHEY, S.J.

WARNER, J.:  Kansas statutes direct the Kansas Corporation Commission to regulate and oversee natural gas public utilities in this state. This oversight includes setting and approving the rates utilities charge their customers. But Kansas law also directs the Commission to investigate other practices or acts by regulated utilities that are unfair, unjust, or unreasonable—regardless of the rate charged. And the law vests the Commission with discretion to craft appropriate remedies when faced with a utility's unfair practices.

Here, various customers filed a complaint with the Commission, alleging their natural gas company had been consistently miscalculating the amount of gas it was providing them and then overbilling them by 9.5%. The Commission recognized the company had engaged in this practice but nevertheless declined to take meaningful

3

remedial action because the rates the company charged were reasonable. The district court reversed, finding the company's billing error was unfair, unjust, and unreasonable.

We find the Commission's order conflated its rate-making duties with its other regulatory responsibilities. Because the Commission failed to take action when a company had consistently and continuously overcharged its customers for the natural gas they received, we affirm the district court's reversal of the Commission's order regarding the company's unfair practices. But Kansas law vests the agency—not the district court—with the responsibility to investigate and craft a remedy that balances the interests of the customers and the public generally. Accordingly, we reverse the district court's dispositional order and remand the case to the Commission to determine the appropriate remedy.

FACTUAL AND PROCEDURAL BACKGROUND

Texas-Kansas-Oklahoma Gas, LLC (TKO) is a Texas-based limited liability company that has operated a natural gas system in Texas for over 20 years. More recently, TKO has maintained a limited service for customers in Oklahoma and Kansas. In Kansas, TKO operates as a middleman, buying gas from other natural gas suppliers and reselling that gas to its customers. TKO does not operate a natural gas gathering system in this state.

TKO began selling natural gas in Kansas in August 2007, when it purchased the right to sell gas to 182 residential and nonresidential customers from Anadarko Gas Gathering Company. After buying the contract rights to Anadarko's customers, TKO filed an application with the Commission for certification as a Kansas natural gas public utility. TKO began providing gas to its Kansas customers while its application was pending, operating without a certificate from August 2007 until April 2010.

4

TKO's application requested a customer-specific certificate, which would permit it to sell gas on a customer-by-customer basis to Anadarko's previous customers and negotiate new contracts with nonresidential natural gas customers. TKO's rates for its limited residential customers were frozen and could not be changed without Commission approval. Because TKO merely sought authority to assume Anadarko's existing contracts, its certification process did not require a formal public rate-setting process or necessitate a formal tariff like other Kansas public utilities.

In 2010, the Commission granted TKO's application, permitting TKO to become a public utility but limiting its service to "a defined list of customers under individual gas purchase contracts." To date, TKO remains unique among natural gas public utilities in Kansas since its business consists solely of customer-specific certificates. To receive its permanent certification—granted in March 2012—TKO was required to meet several additional conditions. One required TKO to file all customer contracts with the Commission so it could evaluate the contracts' price consistency and terms. Another required TKO to file any new or renegotiated contracts and an annual report of its operations with the Commission.

In December 2014, one of TKO's residential customers (Richard Hanson) and several of TKO's nonresidential customers (collectively discussed here as "the Irrigators") filed a complaint with the Commission under K.S.A. 66-1,205. The complaint alleged TKO had engaged in an unfair, unjust, and discriminatory billing practice since 2007. Hanson's claim against TKO was successful and is not at issue in this appeal; TKO admitted to charging him a rate well above what the Commission approved.

The Irrigators' complaint alleged that TKO had improperly calculated the heat content of the gas it sold to its customers and thus consistently overcharged by 9.5%. The complaint alleged that TKO had measured the volume of the gas sold to its customers at a different pressure than the pressure used to calculate its heat content; this practice

5

misrepresented the amount of gas sold. The Irrigators claimed this practice caused them to be overbilled $100,982.32 from 2007 to 2015 or, alternatively, $72,411.63 from 2010 to 2015.

*TKO's Billing Practices—Calculating the Heat Content of Natural Gas*

Before further discussing the procedural history in this case, we must examine how natural gas is measured and billed. Natural gas is a mixture of different naturally occurring alkanes such as methane, ethane, and propane, and sometimes a small percentage of carbon dioxide, nitrogen, hydrogen sulfide, or helium. Together, these components constitute the gas stream. The heat energy of natural gas is based, in part, on its chemical composition, determined using a gas chromatograph to estimate the molar composition of each component in the gas stream.

Once the molar composition is known, the heat content of a given volume of gas can be calculated using the respective ideal gas values for each component. The heat content—or energy—of natural gas is measured in MMBTU (million British Thermal Units). And many natural gas companies, including TKO, sell gas to customers at a given price per MMBTU ($/MMBTU).

According to Leo Haynos, the Commission's Chief Engineer who authored two staff reports in this case, there is no way to consistently measure the heat content of the natural gas a company sells. The actual heat content of the gas in a pipeline is infrequently measured—perhaps only once per year. Instead, Haynos explained chemical engineers "measure volume, and we convert it to energy. . . . [T]he only thing they really are measuring on site is the volume. And then they relate that back through a calculation to the amount of energy that was sold." Put more simply, because MMBTU is a measure of heat, not volume, it cannot be measured with a displacement meter. Instead, the gas

6

company uses a formula to calculate the MMBTU sold from the volume of gas (measured in Mcf, or thousand cubic feet) provided to a customer in a billing cycle.

To convert the volume of gas sold in Mcf into MMBTU (its heat content), the gas company uses a formula incorporating the gas' temperature, pressure, and chemical composition. In particular, as a report by Commission staff observed, "the reference temperature and pressure of the BTU calculation are critical to creating a fungible unit of measurement." The sticking point in this case is the reference pressure—or the *pressure base*—used by TKO in that calculation. The pressure base (measured in pounds per square inch absolute or psia) is essentially the average pressure the natural gas is under when its heating value and volume are measured.

The volume of a gas is inversely proportional to its pressure. Thus, when other factors such as temperature and the number of molecules of a gas remain constant, higher pressure compresses the gas, while lower pressure allows the gas molecules to expand into a greater volume. Hanson, the sole residential customer complainant and a consulting engineer called by the Irrigators, explained the importance of using the same pressure base when calculating volume and heat content:

> "A Mcf is a measure of volume, and an MMBTU is a measure of heating value. Because natural gas is sold by its heating value, sales must be converted to reflect the volume based on the heating value—i.e. BTU content. Thus it is also necessary to measure both the Mcf and the BTU content at a given pressure. The pressure used to measure both volume (Mcf) and heating value (BTU) is known as a pressure base. *Because both BTU/cu ft. and volume (Mcf) vary with pressure, the same pressure (commonly referred to as the pressure base) must be used to calculate both the BTU/cu ft. value and the Mcf Volume.* If pressure of a fixed quantity of gas increases, the volume decreases, and vice versa, but the total MMBTU of that fixed quantity of gas remains the same." (Emphasis added.)

7

A staff report compiled by Haynos explained that if the pressure base used for measuring heat content is lower than the pressure base used for measuring the volume, then the heat content per cubic foot of gas would be lower (because fewer molecules would be contained per cubic foot) and vice versa. Both Hanson and Haynos testified the specific pressure base a gas company uses does not matter so long as it remains constant for calculating both the volume and heat content of the gas sold.

TKO purchases natural gas from Anadarko and its other suppliers using an industry-standard pressure base of 14.65 or 14.73 psia. This means that when TKO pays Anadarko a certain $/MMBTU, the total MMBTU purchased is calculated from the volume of gas sold to TKO using a pressure base of 14.65 or 14.73 psia.

TKO's contracts with its customers, and its customers' account summaries and invoices, are priced per MMBTU sold. These contracts did not specify a pressure base. When TKO assumed the contracts from Anadarko's customers in 2007, it determined for economic reasons—presumably, to make it feasible to provide natural gas at the locked-in contract rate—to deliver gas to those customers using a pressure of 13.45 psia. It has continued to use a 13.45-psia pressure when measuring the volume of gas sent to its customers for the entire time it has done business in Kansas.

In their second report to the agency, Commission staff described TKO's practice of using a different pressure when delivering gas to its customers than that used to calculate the gas' heat content:

> "After purchasing the gas, TKO unilaterally defined the volume of gas to be sold as a cubic foot at 60°F and 13.45 psia. . . . By reducing the reference pressure of the cubic foot held for sale, TKO reduced the amount of gas and the thermal content that could be contained in the cubic foot held for sale. TKO then applied the unadjusted heat content value it had received from Anadarko when the gas was purchased."

8

Staff concluded that TKO's "manipulation of the gas volume sold without performing a corresponding modification of the BTU [heat] content for that volume overstates the BTU value of the gas sold by approximately 9.5%." Because TKO sells gas to customers at a certain price per MMBTU, "overstating the amount of BTUs purchased results in overcharging the customer by 9.5%."

*Proceedings before the Commission*

In its response to the Irrigators' complaint, TKO did not address the Irrigators' contention that it used a different pressure to measure the volume of gas provided to its customers than Anadarko used in calculating the heat content of that gas. Instead, TKO claimed it was standard industry practice for a natural gas seller to establish the pressure base for its gas sales contracts and billing calculations. TKO also noted the terms of the contracts were agreed to by the Irrigators and approved by the Commission.

Commission staff began an investigation and compiled an initial report, finding TKO had overstated the BTU value of the gas it was selling and thereby overcharged its customers. The first staff report recommended that the Commission assess a $7,100 civil penalty for a variety of compliance issues; require TKO to file a rate case to set appropriate rates, gas tariffs, and service requirements; require TKO to amend all of its contracts to account for the appropriate pressure base; and order TKO to refund its customers 9.5% for the cost of the overcharge going back to 2012.

To prepare for the agency's evidentiary hearing, Commission staff compiled a second report based on its continued investigations and the evidence produced by the parties during discovery. Although the second staff report contained the same four recommendations as the first, it included three additional observations:

- *First*, contrary to the Irrigators' assertion that TKO had intentionally manipulated the pressure base to increase its revenue, staff categorized TKO's miscalculation as a "billing error"—noting "the BTU value stated on the customer's bill and used in calculating the customer's monthly charging is incorrect."

- *Second*, the report noted that TKO's gas prices were low enough compared with others in the industry that, even with TKO's overstatement of the BTU value of gas it was selling, its rates ($/MMBTU) were still potentially reasonable. To this end, the report compiled data on the rates charged by TKO's competitors and suppliers and found TKO's rates, despite the billing error, were among the cheapest in the region.

- *Third*, the report noted that TKO's financial condition was potentially too precarious for a refund to be in the public interest. The report cautioned that if a refund were ordered, it should "be structured in such a manner that [its] financial viability . . . is not jeopardized." This recommendation was based on staff's concern over TKO's significant financial losses in recent years and the possibility that TKO could go bankrupt if ordered to refund the Irrigators.

Even so, the second report maintained that it would be equitable for the Commission to require TKO to provide refunds to its customers for the overbilled amounts—so long as payments could be structured in a manner to protect TKO's financial viability.

After a two-day evidentiary hearing, the Commission denied the Irrigators their requested relief. At the hearing, TKO admitted the staff report was correct regarding the billing error, conceding it had provided gas to its customers at a different pressure than what was used to calculate heat content, thereby inflating its customers' bills by 9.5%. But instead of scrutinizing TKO's billing practices, the Commission focused on the rates

TKO ultimately charged its customers, finding the ultimate cost of the natural gas to be reasonable—no harm, no foul.

In reaching its decision, the Commission focused on TKO's private-rate contracts and their presumption of validity. The Commission found that the Irrigators were required to overcome that presumption but failed to do so. In particular, the Commission concluded TKO's error in its billing *practice* did not render its *rates* per se unreasonable or unjust—at least not standing alone. While the Commission agreed public utilities cannot manipulate their billing parameters to increase revenues and must comply with the Commission's rules and approved rates, TKO's contracts did not require the company to use a certain pressure base for its calculations. And the Commission noted there was no evidence TKO had changed its billing practices since the Commission originally approved its contracts with the Irrigators. Finally, the Commission found the fact that TKO's rates remained cheaper than most gas companies in southwest Kansas—despite the 9.5% overbilling—undermined the Irrigators' claims.

*Reversal by the District Court*

After the Commission denied their motion for reconsideration, the Irrigators petitioned for district court review under the Kansas Judicial Review Act (KJRA). The Irrigators presented their KJRA petition on two fronts, arguing the Commission's order failed to resolve issues requiring resolution under K.S.A. 77-621(c)(3) and erroneously interpreted and applied the law under K.S.A. 77-621(c)(4). Although framed differently, both arguments centered on the same allegation—the Commission erroneously focused on the reasonableness of the *rates* set by their private contracts with TKO instead of TKO's *practice* of overbilling customers.

The district court reversed the Commission's final order, ruling it was "factually, logically and legally erroneous, not supported by the record or the evidence and arbitrary

and capricious." The court concluded that the Commission's rationale focused exclusively on "rate making principles based on contract terms" and ignored "the uncontroverted evidence that TKO's billing practices unfairly inflated billings of MMBTU's by 9.5% from the first date it began operating in Kansas." The district court ordered the Commission to calculate the exact amount TKO had overbilled its customers since 2007 and directed the agency to order TKO to refund those amounts.

TKO appeals, asking this court to reinstate the Commission's order.

DISCUSSION

1. *The Commission incorrectly applied K.S.A. 66-1,205 and K.S.A. 66-1,206 when it focused on the rate charged by TKO instead of TKO's unfair billing practices.*

In an appeal from an administrative decision under the KJRA, we "exercise the same statutorily limited review of the agency action as" the district court, deciding the case "as though the appeal had been made directly to the appellate court." *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 880, 317 P.3d 124 (2014); see also *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017) (finding the scope of review is the same whether a KJRA action is before a district court or the Kansas Supreme Court). This means that even though TKO has appealed the district court's reversal to this court, the burden of proving the Commission's decision was erroneous lies with the Irrigators. K.S.A. 77-621(a)(1).

As a starting point, there is no question TKO is a "natural gas public utility" under K.S.A. 66-1,200 et seq. Kansas law therefore gives the Commission "full power, authority and jurisdiction to supervise and control" TKO and "empower[s]" the Commission "to do all things necessary" to carry out this responsibility. See K.S.A. 66-1,201. This case turns on the Commission's exercise of this charge—most notably, its

12

interpretation of K.S.A. 66-1,205 and K.S.A. 66-1,206 and its application of these statutes to the Irrigators' complaint.

Although the Commission is charged with interpreting and applying the statutes governing its authority, Kansas courts give no deference to agencies' interpretation of statutory language. See *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013) (no deference given to agencies' interpretation of statutes). Instead, statutory interpretation is a quintessentially legal question over which appellate courts' review is unlimited. *In re Tax Appeals of Genesis Health Clubs*, 42 Kan. App. 2d 239, 242, 210 P.3d 663 (2009), *rev. denied* 290 Kan. 1094 (2010). A claim under K.S.A. 77-621(c)(4) that an agency erroneously interpreted and applied the law is likewise reviewed de novo. *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 848, 397 P.3d 1205 (2017).

The primary aim of statutory interpretation is to give effect to the legislature's intent, expressed through the plain language of a statute. *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 2, 374 P.3d 680 (2016). We therefore do not add or ignore statutory text, and we give ordinary words their ordinary meanings. See 304 Kan. 755, Syl. ¶ 3; *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984).

K.S.A. 66-1,205(a) defines the circumstances under which the Commission may review a complaint—such as that brought by the Irrigators here—involving a natural gas public utility's rates, rules, regulations, practices, or acts:

> "*Upon a complaint in writing made against any natural gas public utility governed by this act* that any rates or rules and regulations of such natural gas public utility are in any respect unreasonable, unfair, unjust, unjustly discriminatory or unduly preferential, or both, or *that any rule and regulation, practice or act whatsoever* affecting or relating to any service performed or to be performed by such natural gas public utility for the public, *is in any respect unreasonable, unfair, unjust*, unreasonably inefficient or

insufficient, unjustly discriminatory or unduly preferential, or that any service performed or to be performed by such natural gas public utility for the public is unreasonably inadequate, inefficient, unduly insufficient or cannot be obtained, *the commission may proceed*, with or without notice, *to make such investigation as it deems necessary*." (Emphases added.)

To date, Kansas cases interpreting this statute have focused primarily on the Commission's rate-making authority—that is, whether a natural gas utility's rates "are in any respect unreasonable, unfair, [or] unjust" under K.S.A. 66-1,205(a). See *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 490, 720 P.2d 1063 (1986); *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 357, 42 P.3d 162 (2002). Because natural gas rates are a product of notice-and-comment rulemaking—with time for extensive agency investigation and public feedback—or private contracts, Kansas courts give significant deference to the rates set or approved by the Commission. See *Kansas Gas & Electric Co.*, 239 Kan. at 498-516 (analyzing the reasonableness of the "overall result" of the Commission's public rate-making decision); *Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 561, 426 P.2d 60 (1967) (upholding private rate contracts unless the rates set are inherently unreasonable). Under these auspices, the Commission declined to take action against TKO—even though TKO admitted its billing error led to overcharging its customers—because the ultimate rates were reasonable.

But the text of K.S.A. 66-1,205(a) does not limit the Commission's regulatory authority to a rate-reviewing function. Instead, it provides the Commission broad authority to determine whether "any rule and regulation, practice or act whatsoever . . . is in any respect unreasonable, unfair, [or] unjust." K.S.A. 66-1,205(a). K.S.A. 66-1,206(a), which authorizes the Commission's authority upon concluding its investigation, similarly empowers the agency in cases involving not only rates but also other regulations, practices, and acts:

14

"If after investigation and hearing the rates or rules and regulations of any natural gas public utility governed by this act are found unjust, unreasonable, unfair, unjustly discriminatory or unduly preferential, or in any way in violation of the provisions of this act, or of any of the laws of the state of Kansas, the commission shall have the power to establish, and to order substituted therefor, such rates or rules and regulations as the commission determines to be just, reasonable and necessary. *If it is found that any regulation, practice or act, relating to any service performed or to be performed by such natural gas public utility for the public is in any respect unreasonable, unjust, unfair,* unreasonably inefficient or insufficient, unjustly discriminatory or unduly preferential, or otherwise in violation of any of the provisions of this act or of any of the laws of the state of Kansas, *the commission may substitute therefor such other regulations, practice, service or act as it determines to be just, reasonable and necessary*." (Emphases added.)

Kansas statutes therefore direct the Commission not merely to review the rates charged by natural gas public utilities in this state, but also to oversee the utilities' practices to ensure they are not "in any respect unreasonable, unjust, [or] unfair." K.S.A. 66-1,206(a). If the agency finds any practice deficient, it may correct the utility's error "as it determines to be just, reasonable[,] and necessary." K.S.A. 66-1,206(a). This authority is "liberally construed" so the Commission can carry out its charge. K.S.A. 66-1,207.

Here, the Commission recognized that the "crux" of the Irrigators' argument was that "TKO employed an invalid methodology for calculating the BTU of the natural gas it sold to Complainants and therefore overcharged them by 9.5%." But instead of considering whether this practice was unreasonable or unfair under K.S.A. 66-1,206(a), the Commission sought to determine whether this "practice results in unjust or unreasonable rates." The Commission answered this question in the negative, finding TKO's billing methodology did not render its rates unreasonable.

There are multiple problems with this approach. First, the rates included in TKO's contracts—that is, the $/MMBTU—were not the focus of the Irrigators' argument. Instead, the complaint alleged that because TKO measured MMBTU and meted out

15

volume at different reference pressures, the company was consistently providing roughly 10% fewer MMBTU than the Irrigators believed they were paying for, regardless of the rate charged. The question posed to the Commission was whether this billing practice—which TKO admitted to have employed—was "in any respect unreasonable, unjust, [or] unfair." K.S.A. 66-1,206(a).

Likewise, the Commission's construction of the Irrigators' complaint as a challenge to TKO's rates is not supported by the record. Our review of the Irrigators' complaint reveals that although the complaint occasionally referenced TKO's unfair "rates," it used this term broadly and synonymously with TKO's billing "charges." For example, in their prayer for relief, the Irrigators asked the Commission to "investigate and compute the amount of charges *or rates* which have been overbilled and with respect to past sales made under such unfair and discriminatory terms *or rates*." (Emphases added.) These references to "rates" do not imply the contractual rate of $/MMBTU was unfair, but that TKO's invoices overstated the amount of gas provided to its customers.

And to the extent the Commission considered the merits of the Irrigators' allegations relating to TKO's billing methods, its analysis focused not on whether TKO's practice was unreasonable, but on whether TKO was legally obligated to use a specific pressure base for calculating volume and heat content. The agency's discussion thus failed to grasp the nature of the misconduct alleged—that by using *different* pressures to calculate volume and heat content, regardless of what those pressures were, TKO misrepresented the amount of gas the Irrigators were receiving and consistently overcharged them by almost 10%.

Although the parties dispute TKO's motivation for using the different pressures in its calculations, no one contests that the company engaged in this erroneous practice. The Commission's authority to take action under Kansas law does not turn on whether the billing error arose from a particular intent, but whether the "practice or act . . . is in any

16

respect unreasonable, unjust, [or] unfair." K.S.A. 66-1,206(a). A panel of this court recently examined these terms— unreasonable, unjust, and unfair—and noted their expansive grant of authority to the Commission:

"As such words are left undefined by the Legislature, we look to their common and ordinary meaning. 'Unfair' has been defined as '[n]ot honest, impartial or candid; unjust.' Black's Law Dictionary 1760 (10th ed. 2014). 'Unjust' has been defined as '[c]ontrary to justice; not fair or reasonable.' Black's Law Dictionary 1771 (10th ed. 2014). Likewise, 'unreasonable' is defined as '[n]ot guided by reason; irrational or capricious.' Black's Law Dictionary 1772 (10th ed. 2014)." *SWKI-Seward West Central, Inc. v. Kansas Corporation Comm'n*, No. 116,795, 2018 WL 385692, at *8 (Kan. App. 2018) (unpublished opinion).

Regardless of the rates included in TKO's contracts, the company's billing practice meets these definitions. TKO's calculations caused the company to inform its customers they were using—and to charge them for—9.5% more MMBTUs of gas than they actually received. This practice was neither honest nor fair.

In ignoring its statutory charge in K.S.A. 66-1,205 and K.S.A. 66-1,206—focusing on the rates in TKO's customer contracts to the exclusion of TKO's other regulations, practices, and acts—the Commission committed an error of law. And the agency similarly erred in concluding TKO's contractual rates somehow shielded the company from liability for an unreasonable and unfair billing practice. We agree with the district court that the Commission's order erroneously applied the law and, in so doing, failed to decide the central issue in the Irrigators' complaint. See K.S.A. 77-621(c)(3), (4). The district court correctly reversed the agency's order on the merits of the Irrigators' claim.

17

2. *We remand the case to the Commission to balance the various available remedies with the public interest, and thereby determine the best course of action going forward.*

K.S.A. 66-1,206(a) vests the Commission with authority to craft a remedy when a natural gas public utility's rates or practices are found to be "unreasonable, unjust, [or] unfair." Because the Commission found TKO's rates and practices were not unreasonable, it never reached the question of what remedy would be appropriate. The district court—having identified TKO's billing error and concluded it was unfair and unreasonable—"remanded [the case] to the Commission to calculate and order that TKO make refunds to its irrigation customers based on the 9.5% overbilling from the date TKO first began operations in Kansas in 2007 to the present."

TKO argues that the district court's refund order exceeded the court's authority in two respects. *First*, TKO asserts Kansas law vests the Commission—not the district court—with discretion to order an appropriate remedy, and the appropriate course was therefore to remand the case to the agency. *Second*, TKO argues that in ordering a refund of all overcharges since 2007, the district court ignored the Commission's jurisdictional finding that it only could regulate TKO's conduct from when it was provisionally certified in 2010. The company asserts that the Irrigators failed to seek the Commission's reconsideration of this jurisdictional finding, a step required before it can seek judicial review under the KJRA. See K.S.A. 66-118b ("No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall petition for reconsideration in accordance with the provisions of K.S.A. 77-529."); K.S.A. 77-612 (KJRA's exhaustion-of-administrative-remedies requirement).

We agree with TKO's first point: K.S.A. 66-1,206 charges the Commission with the task of crafting an appropriate remedy when faced with an unfair practice. This allows the agency to investigate the ramifications of various courses of action—whether

18

some form of refund, rate adjustment, penalty, or other remedy—and determine which is in the best interest of the complainants and the public. This balancing is particularly important here, when the Commission and its staff expressed concerns about TKO's financial solvency if an immediate refund were ordered. Indeed, the second staff report observed that "a refund that results in bankruptcy of a public utility is clearly not in the public interest," and any potential refund must be structured in a way to protect the public from this possibility.

We understand the district court's frustration with the Commission's order in this case. And a district court generally enters judgment for a party's full liability, as the district court did here. But this case originated before the Commission, not the courts. By ordering the refund without first allowing the agency the opportunity to craft a workable remedy, the district court overstepped its authority. See K.S.A. 66-1,206(a); see also K.S.A. 77-621(c) (limiting courts' review of agency actions); *Genstar Chemical Ltd. v. I.C.C.*, 665 F.2d 1304, 1309 n.3 (D.C. Cir. 1981) (recognizing Commission has broad authority "to fashion an appropriate remedy"). We therefore reverse the district court's refund order and remand the case to the Commission to determine the appropriate remedy for TKO's unfair billing practices. Because we are reversing the court's refund order, we need not decide whether the timeframe of the previously ordered refunds—from 2007, not 2010—was also erroneous. Accord *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016) ("Kansas courts do not issue advisory opinions.").

The decision of the district court reversing the Commission's final order is affirmed in part and reversed in part. The Commission's order is reversed. And the case is remanded to the agency with directions to consider the appropriate steps to remedy TKO's consistent overcharging of its customers.