IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,834

RICHARD L. HANSON, CIRCLE H FARMS LLC, ROME FARMS LLC,
STEGMAN FARMS PARTNERSHIP,
*Appellees*,

v.

KANSAS CORPORATION COMMISSION, *Respondent*,
and
TEXAS-KANSAS-OKLAHOMA GAS, LLC,
*Appellant.*

SYLLABUS BY THE COURT

1.

Under the Kansas Judicial Review Act, K.S.A. 77-601 et seq., a court shall grant judicial relief from an agency action only if it determines there exists one or more of the eight circumstances enumerated in K.S.A. 77-621(c).

2.

K.S.A. 77-621(c)(3) authorizes judicial relief when an agency action fails to decide an issue requiring resolution. When addressing a challenge under K.S.A. 77-621(c)(3), a reviewing court exercises unlimited review.

3.

K.S.A. 77-621(c)(4) authorizes judicial relief when an agency action is based on the agency's erroneous interpretation or application of the law. A reviewing court exercises unlimited review of the agency's interpretation or application of the law without deference to the agency.

1

**4.**

K.S.A. 77-621(c)(7) authorizes judicial relief when an agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole. This includes the agency record, supplemented by any additional evidence received by the court under the KJRA. K.S.A. 77-621(d) defines substantial evidence "'in light of the record as a whole'" to include evidence both supporting and detracting from the agency's factual findings.

**5.**

Kansas courts do not consider an issue unless it is ripe.

Review of the judgment of the Court of Appeals in 58 Kan. App. 2d 82, 464 P.3d 357 (2020). Appeal from Stevens District Court; BRADLEY E. AMBROSIER, judge. Opinion filed July 16, 2021. Judgment of the Court of Appeals affirming in part and reversing in part the district court is affirmed on the issues subject to review. Judgment of the district court is affirmed in part and reversed in part. The case is remanded to the Kansas Corporation Commission with directions.

*Jeremy L. Graber*, of Foulston Siefkin LLP, of Topeka, argued the cause, and *C. Edward Watson II*, and *Daniel J. Buller*, of the same firm, were with him on the briefs for appellant.

*Lee Thompson*, of Thompson Law Firm, LLC, of Wichita, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

BILES, J.: A natural gas utility company appeals from two lower court decisions that held it unlawfully billed its customers. See *Hanson v. KCC*, 58 Kan. App. 2d 82, 95, 464 P.3d 357 (2020) (declaring the utility's billing practice was "neither honest nor fair"). The utility argues a Kansas Corporation Commission order that upheld the company's

2

billing calculation deserves more deference. The controversy arises after three customers who bought gas for their irrigation operations alleged the utility overcharged them by distorting the energy content of the gas sold. The customers claim this overpriced their gas by about 9.5%. But the Commission determined the utility did not violate state law even though it acknowledged that for each cubic foot of gas the utility sold, it charged its customers for the energy that would have been contained in a more concentrated gas of the same volume.

We affirm the lower courts' judgment that the utility's invoicing practice was "unjust, unreasonable, [or] unfair" under K.S.A. 66-1,206(a). We remand the case to the Commission to fashion an appropriate remedy. See K.S.A. 66-1,205(b) (empowering Commission to require natural gas public utilities "to make such improvements and do such acts as are or may be required by law to be done"); K.S.A. 66-1,206(a) (empowering Commission to substitute "such other regulations, practice, service or act as it determines to be just, reasonable and necessary").

FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Texas-Kansas-Oklahoma Gas, LLC, began selling natural gas in Kansas to residential and nonresidential customers acquired from Anadarko Gas Gathering Company. In 2010, the Commission conditionally granted TKO a limited certificate of public convenience and authority, with final approval in 2012. The Commission allowed TKO to serve specific customers transferred from Anadarko and to negotiate individual contracts for natural gas service with nonresidential customers. This meant traditional utility rate making at the Commission level did not take place. The certificated rate for customer sales was the price set by private contract. But as the panel correctly observed, it is undisputed TKO is a "'[n]atural gas public utility'" under K.S.A. 66-1,200 et seq.

3

*Hanson*, 58 Kan. App. 2d at 91; see also K.S.A. 66-104 (definition of public utility subject to agency's supervision).

In 2014, Richard L. Hanson, a residential customer, along with Circle H Farms LLC, Rome Farms LLC, and Stegman Farms Partnership, complained to the Commission about TKO's billing practices. Hanson is no longer a party. The three remaining are nonresidential customers who bought gas for agricultural irrigation purposes, referred to here as "the Irrigators." As TKO explains, their contracts with TKO refer only to a rate per MMBtu (metric million British thermal units). The rate is on an "index plus" basis, meaning the price fluctuates based on a published index, plus a fixed additur (e.g., index plus $.50 per MMBtu). The Irrigators explained in their complaint:

> "The rates and charges of TKO appear to calculate volume using a pressure base of 13.45 psia [pounds per square inch absolute] and a btu factor measured at a pressure base of 14.73 psia, an inconsistency and inaccuracy which results in customers being charged approximately 9.5% more for irrigation gas than is justified under commonly accepted industry standards, as historically interpreted and applied by the Kansas Corporation Commission."

The Irrigators argued "the *rates* charged by TKO to [them] . . . for the sale of natural gas are unreasonable, unfair, unjust . . . and are therefore unlawful and void." (Emphasis added.) As for why TKO's rates were unlawful, they alleged, "The *calculations and billing practices* employed by TKO [used] inaccurate or false pressure base numbers." (Emphasis added.) Said another way, the Irrigators presented two distinct but interrelated issues—unlawful rates and unlawful billing practices. TKO denied the allegations.

The Irrigators brought these challenges to the Commission under K.S.A. 66-1,205(a), which provides:

4

"Upon a complaint in writing made against any natural gas public utility governed by this act that *any rates or rules and regulations of such natural gas public utility are in any respect unreasonable, unfair, unjust*, unjustly discriminatory or unduly preferential, or both, or that *any rule and regulation, practice or act whatsoever affecting or relating to any service performed or to be performed by such natural gas public utility for the public, is in any respect unreasonable, unfair, unjust*, unreasonably inefficient or insufficient, unjustly discriminatory or unduly preferential, . . . the commission may proceed, with or without notice, to make such investigation as it deems necessary." (Emphases added.)

And in their prayer for relief, the Irrigators asked:

"Upon confirmation of the truth of the allegations of unfair, unjust and discriminatory rates, complainants ask the Commission to enter an order:

"(a) substituting such rates or rules and regulations as the Commission determines to be just, reasonable and necessary;

"(b) adjusting the rates of TKO as to all future sales of natural gas and adjustment of the measurements, calculations, and practices which are the gist of the problem; and,

"(c) investigate and compute the amount of charges or rates which have been overbilled and with respect to past sales made under such unfair and discriminatory terms or rates to issue a show cause order as to why TKO should not refund all overcharges shown to have been imposed since August, 2007 or the first date of each jurisdictional meter which TKO operates."

It is important to appreciate three important aspects to the calculation making up the Irrigators' gas bills:  (1) price, which is the dollar amount charged per MMBtu, (2) volume (Mcf or MMcf), which is the cubic feet delivered to the customer at a pressure

base, and (3) energy, which is an amount of MMBtu's in the measured cubic foot as the designated pressure base. Our concern here is with the pressure base factor used when measuring volume because TKO applied a different pressure base when it sold the gas to the Irrigators than the one used to measure the energy content by volume when TKO bought the gas from third-party suppliers. As the district court explained:

> "Natural gas is delivered by TKO to irrigators through a positive displacement meter which generates the volumes per thousand cubic feet (Mcf). When gas is sold pursuant to contracts which base pricing on heating values (Btu's) it is necessary to convert the volumes of Mcf's to reflect the volume based on the heating value expressed per MMBTu's.

> "Measurement of molecules of natural gas depends on the pressure because natural gas is compressible. If the pressure of a fixed quantity of gas [molecules] increases, the volume decreases. If pressure decreases, the volume increases."

The Court of Appeals provided this succinct description of the technical aspects underlying the Irrigators' complaint:

> "To convert the volume of gas sold in Mcf into MMBTU (its heat content), the gas company uses a formula incorporating the gas' temperature, pressure, and chemical composition. In particular, as a report by Commission staff observed, 'the reference temperature and pressure of the BTU calculation are critical to creating a fungible unit of measurement.' The sticking point in this case is the reference pressure—or the pressure base—used by TKO in that calculation. The pressure base (measured in pounds per square inch absolute or psia) is essentially the average pressure the natural gas is under when its heating value and volume are measured.

> "The volume of a gas is inversely proportional to its pressure. Thus, when other factors such as temperature and the number of molecules of a gas remain constant, higher

6

pressure compresses the gas, while lower pressure allows the gas molecules to expand into a greater volume." *Hanson*, 58 Kan. App. 2d at 86.

Leo Haynos, the Chief Engineer of the Commission's Utility Division, prepared two staff reports for the agency proceedings. He explained that although TKO's contracts were priced based on energy (MMBtu), volume (MMcf) still mattered because volume is "the surrogate way of measuring energy." And since there is "no good way to measure" the heat content, he said, "we measure volume, and we convert it to energy." So, he added, for utilities like TKO that resell gas purchased from suppliers the pressure base at "the purchase point" and the pressure base at "the sales point" must be identical.

But here TKO's use of a lower reference pressure at its sales point to customers increased the gas volume delivered without accounting for the corresponding MMBtu reduction. And recall that TKO's contracts refer only to a rate per MMBtu. In Haynos' words, "to price the gas for the customer in dollars per million BTUs ($/MMBTU), TKO simply multiplies the volume calculated at 13.45 psia by its suppliers' BTU value (obtained at 14.73 psia)." By doing this, Haynos continued, TKO misrepresented the amount of energy (MMBtu) delivered to the Irrigators. He offered two possible ways to correct this misrepresentation—either negotiate with customers to use the 13.45 psia pressure base by disclosing it and agreeing to it, or use the same pressure base as the suppliers so the energy factor remains reasonably constant.

Haynos' second staff report concluded:

"[T]his manipulation of the gas volume sold without performing a corresponding modification of the BTU content for that volume overstates the BTU value of the gas sold by approximately 9.5%. Because TKO's contracts with its customers state a price in $/MMBTU, overstating the amount of BTUs purchased results in overcharging the customer by 9.5%."

7

*The Commission's order*

After a two-day evidentiary hearing, the Commission decided the Irrigators failed to carry their burden of proving "TKO's rates or practices with regard to them are unreasonable."

As to the rate question, the Commission largely relied on Haynos' report stating that TKO's "gas sales rate even with the misapplied BTU adjustment may be a reasonable rate" for the region. It noted TKO's contracts did not include reference to a pressure base or specifics about calculating the BTU value of the gas. Similarly, the Commission continued, neither the conditional nor final certificates issued to TKO referenced a specific pressure base. And it cited *Kansas Gas and Elec. Co. v. State Corp. Comm'n*, 239 Kan. 483, 488, 720 P.2d 1063 (1986), to support its conclusion that rates are just and reasonable if they are within a "zone of reasonableness," balancing the interests of: "(1) the utility's investors vs. the ratepayers; (2) the present ratepayers vs. the future ratepayers; and (3) the public interest." Finally, the Commission held private contracts for service, such as those with the Irrigators, that set rates consistent with those filed with the Commission should be respected unless "the public welfare is being adversely affected by such contracts," citing *Kansas Power & Light Co. v. Mobil Oil Co.*, 198 Kan. 556, 559, 426 P.2d 60 (1967).

Regarding TKO's billing practice, the Commission also relied on Hanson's testimony that there was no regulatory requirement for a utility to use the same pressure base as its suppliers when calculating the gas volume delivered to customers. And it rejected the agency's staff recommendation to use Docket 34,856-U Rule, Rules and Regulations Relating to Standards of Quality, Pressure, Accuracy of Measurement,

8

Safety and Service of Natural Gas in the State of Kansas, January 16, 1961. As characterized by the Commission,

> "[t]he 34,856-U Docket Rule offers a standard measurement when a pressure base is not determined. What the reading of the 34,856-U Docket Rule and the testimony suggests is that there is not necessarily a violation for using a different pressure base—*the actual violation here is that it was not disclosed. Therefore, the Commission cannot hold that the 34,856-U Docket Rule is a hardline rule on what pressure base shall be utilized and in turn cannot deduce that TKO is using an improper billing practice or charging unjust or unreasonable rates on that basis*." (Emphasis added.)

The Commission then quoted staff testimony that "TKO gas sales contracts, signed by the Complainants and filed with the Commission do not contain any reference to a pressure base or specifics on calculating the BTU value of the gas." And with this perspective it held it would not evaluate this matter under either the 34,856-U Docket Rule or K.A.R. 82-3-101(a)(36) (generally defining "Gas [cubic foot]" as meaning "the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base. The standard pressure base shall be 14.65 pounds per square inch absolute, and the standard temperature base shall be 60 degrees Fahrenheit.").

As to its comment that "the actual violation here is that it was not disclosed," the Commission explained nondisclosure was reasonable because TKO negotiated its contracts with the Irrigators "with the price term established therein without reference to any pressure base for measurement." The Commission also noted TKO had used the same pressure base since it began operations in Kansas, and that its negotiated contracts with the Irrigators expressly allowed TKO to use a billing methodology "to derive the revenue it calculated it needed to support the business of providing sufficient and efficient service of a natural gas public utility." Finally, it concluded TKO's prices were "among the lowest in the region." In short, the Commission concluded that even though

9

TKO engaged in the complained of practice, it was not necessarily unreasonable, unfair, or unjust because using a different pressure base from the one used by suppliers did not violate either TKO's contracts or its certificate as a public utility.

The Irrigators asked for reconsideration, arguing the Commission misconstrued their complaint as simply attacking the reasonableness of TKO's rates, as opposed to their request for relief in which they sought "investigation and enforcement of TKO's practices and measurement of MMBtu's by the Commission in the exercise of its duty to regulate practices, charges and exactions of the utility." And they contended the Commission's order "confuses a 'rate' with a billing under the rate and approves a charge based on a unilateral and undisclosed alteration of the measurement of MMBtu's."

The Commission refused to change its decision. It said it understood the Irrigators' request for reconsideration to raise three points:

> "First, the Complainants assert that the Commission improperly narrowed the scope of their complaint to one of contract abrogation. Second, the Complainants contend that the Commission has ignored Complainants' request for investigation into TKO's billing practices and instead turned its focus to a determination of whether the contract rates are just and reasonable. Finally, the Complainants argue that the Commission has erred by disregarding alleged facts that through its billing practices, TKO has manipulated, altered, adjusted or otherwise circumvented the Commission's authority thus resulting in a *per se* unjust act."

The Commission disagreed that its reasoning ignored the Irrigators' arguments against TKO's billing methodology. It explained the billing practice was consistent with its contracts. In the Commission's view, the Irrigators were "asking [it] to change the terms of or at the very least read into their contracts with TKO a term that is absent." To that extent, it concluded, the Irrigators were essentially asking to abrogate "part if not the

10

whole of the contracts," and therefore it found they had not met the burden of proving TKO's use of a different pressure base was unlawful. The Commission acknowledged "there are standards or calculation methodologies that may be applicable." But it again emphasized TKO's contracts were silent on the pressure base to be used, and that both Hanson, who gave evidence as a consulting engineer, and Haynos testified TKO was not obliged to use a particular reference pressure. The Commission stated, "Hanson and Haynos' comments were substantial against [the Irrigators'] purported factual support that TKO's billing practices are unreasonable."

*The KJRA appeal in the lower courts*

The Irrigators appealed to the district court under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. They advanced four grounds for relief from the Commission's decision: (1) the agency failed to consider their billing error claim; (2) it erroneously interpreted and applied the law; (3) its final order was based on factual findings not supported by substantial evidence; and (4) its ultimate ruling was arbitrary and capricious. See K.S.A. 77-621(c)(3), (4), (7), and (8). The court agreed with the Irrigators on all points, observing: "TKO unilaterally inflated the measurement of the volume component specified in the contracts for the expressed purpose of meeting its revenue needs." It concluded:

> "The Order at issue if sustained would approve an erroneous manipulation of billing volumes of MMBtu's without notice, approval or consideration by either the Commission or customers. The Order's attempt to avoid that determination by paying homage to rate making principles based on contract terms flies in the face of a liberal construction of the governing statutes and the uncontroverted evidence that TKO's billing practices unfairly inflated billings of MMBtu's by 9.5% from the first date it began operating in Kansas. Such practices are unfair, unjust and unreasonable. In sum, the

11

Order is factually, logically and legally erroneous, not supported by the record or the evidence and arbitrary and capricious."

The district court remanded the case to the Commission to calculate how much TKO overbilled the Irrigators since 2007 and then to order the utility to refund that amount. TKO appealed.

A Court of Appeals panel affirmed the district court in part and reversed in part. It agreed the Commission erred in its analysis of TKO's billing methodology. But the panel altered the district court's refund directive and instead ordered the Commission to decide an appropriate remedy that balances the interests of the customers and the public. It noted: "K.S.A. 66-1,206(a) vests the Commission with authority to craft a remedy when a natural gas public utility's rates or practices are found to be 'unreasonable, unjust, [or] unfair.'" *Hanson*, 58 Kan. App. 2d at 96.

The panel's decision, however, limited its legal basis for granting judicial relief to K.S.A. 77-621(c)(3) (agency failed to resolve an issue requiring resolution) and (c)(4) (agency erroneously applied the law). *Hanson*, 58 Kan. App. 2d at 95. It did not address the district court's additional KJRA justifications for judicial relief under subsections (c)(7) (agency action based on facts not supported by the record) and (c)(8) (agency action otherwise unreasonable, arbitrary, or capricious).

TKO petitioned this court for further judicial review, which we granted. The Irrigators filed a conditional cross-petition for review, which we denied. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

12

THE PANEL'S GRANT OF RELIEF UNDER K.S.A. 77-621(c)(3)

Under the KJRA, a court shall grant judicial relief from an agency action only if it determines there exists one or more of the eight circumstances enumerated in K.S.A. 77-621(c). The panel held the Commission "*failed to decide the central issue* in the Irrigators' complaint." (Emphasis added.) *Hanson*, 58 Kan. App. 2d at 95. This undecided issue, in the panel's view, was the legality of TKO's billing practices, citing K.S.A. 77-621(c)(3). TKO argues the panel erred in this respect because the Commission's order carefully considered that matter. We agree with TKO.

*Standard of review*

When resolving an issue seeking judicial relief under K.S.A. 77-621(c)(3) (authorizing judicial relief if "the agency has not decided an issue requiring resolution"), this court exercises unlimited review. And typically when subsection (c)(3) is implicated, remand to the agency to consider the undecided issue is appropriate unless the question the agency did not resolve is a purely legal one. Compare *Pittsburg State Univ./Kansas Nat. Educ. Ass'n v. Kansas Bd. of Regents/Pittsburg State Univ.*, 280 Kan. 408, 429, 122 P.3d 336 (2005) (remanding the case to the agency for additional findings; citing K.S.A. 77-621[c][3]), with *In re Tax Protest of Emil Liston Foundation*, 13 Kan. App. 2d 353, 355, 771 P.2d 77 (1989) (noting K.S.A. 77-621[c][3] authorized court to decide a question of law when the agency failed to do so).

*Discussion*

In their complaint to the Commission, the Irrigators raised two separate, but closely related, questions—rates and practices. And the Commission plainly ruled on both. On the billing question, it considered various reasons why TKO's unilaterally selected pressure base was not unlawful. And as previously noted, the Commission

13

addressed head on the Irrigators' claim in their request for reconsideration that the agency ignored the billing practice issue in its original order. The Commission explained TKO's billing practice was consistent with the contracts, the Irrigators had not met their burden of proving TKO's use of a different pressure base was unlawful, and that both Hanson and Haynos had testified TKO was not obliged to use a particular reference pressure. Based on those points, the Commission denied reconsideration, noting it "simply could not find that Complainants proved manipulation, misrepresentation, or unreasonableness." That holding effectively resolved the issue the panel held was unresolved. *Hanson*, 58 Kan. App. 2d at 95.

To be sure, the panel disagreed with the Commission's rationale, but that does not mean the Commission failed to decide "an issue requiring resolution" under K.S.A. 77-621(c)(3). The panel's reliance on that statutory basis for granting judicial relief from an agency action was misplaced.

THE PANEL'S GRANT OF RELIEF UNDER K.S.A. 77-621(c)(4)

The next question is whether the panel erred when it determined the Commission "erroneously applied the law" under K.S.A. 77-621(c)(4). *Hanson*, 58 Kan. App. 2d at 95. On this point, we agree with the panel, although this is a more involved question that necessarily implicates another statutory ground for judicial relief—K.S.A. 77-621(c)(7) ("[T]he agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole."). Said differently, facts are needed to make the point, so we must decide if the facts found by the Commission are supported by the agency record. See *Atkins v. Webcon*, 308 Kan. 92, 102, 419 P.3d 1 (2018) (affirming the Court of Appeals as being right for the wrong reason); Supreme Court Rule 8.03(b)(6)(C)(ii) (2021 Kan. S. Ct. R. 54).

14

Judicial review of an agency's interpretation and application of the law is permitted under K.S.A. 77-621(c)(4) and is unlimited without deference to the agency's view. *Via Christi Hospitals Wichita v. Kan-Pak*, 310 Kan. 883, 890, 451 P.3d 459 (2019); *May v. Cline*, 304 Kan. 671, 675, 372 P.3d 1242 (2016); *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013) (rejecting the doctrine of deference to an agency on questions of law).

Subsection (c)(7) requires review of factual determinations for evidence "that is substantial when viewed in light of the record as a whole." Our caselaw has "defined substantial evidence as evidence possessing something of substance and relevant consequence to induce the [agency's] conclusion." *Redd v. Kansas Truck Ctr.*, 291 Kan. 176, 183, 239 P.3d 66 (2010). Subsection (d) provides:

> "For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

When conducting the factual analysis, subsection (d) requires a reviewing court to assess the evidence both supporting and contradicting the agency's findings, examine the agency's credibility determinations, and review the agency's explanation as to why the

15

evidence sustains its findings. *Atkins*, 308 Kan. at 97. And even though subsection (d) demands a reviewing court look at contradicting evidence and assess the agency's credibility decisions, it nevertheless instructs that "*the court shall not reweigh the evidence or engage in de novo review*." (Emphasis added.) K.S.A. 77-621(d). See generally *Frick Farm Properties, L.P. v. State Dep't of Agric., Div. of Water Res.*, 289 Kan. 690, 709, 216 P.3d 170 (2009) ("An appellate court views all the evidence in a light most favorable to the prevailing party, and it does not reweigh competing evidence or assess the credibility of witnesses. This court must accept all evidence and inferences that support or tend to support the findings as true, and this court must disregard all conflicting evidence.").

Finally, Kansas courts "recognize that an agency ruling within its area of expertise is entitled to some deference." *Wasson v. United Dominion Industries*, 266 Kan. 1012, 1018, 974 P.2d 578 (1999). But see *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 (2010) (agency's statutory interpretation "is not afforded any significant deference on judicial review"). This deference to expertise, however, must be employed cautiously so as not to violate the express statutory standard of review mandated by K.S.A. 77-621.

*Discussion*

As quoted above, K.S.A. 66-1,205(a) defines the circumstances under which the Commission may review a complaint about a natural gas public utility's rates or practices. And if the Commission finds unreasonable, unfair, or unjust rates or practices, K.S.A. 66-1,206(a) authorizes it to take action, providing in relevant part:

> "If after investigation and hearing the *rates* or rules and regulations of any natural
> gas public utility governed by this act *are found unjust, unreasonable, unfair*, . . . *the*

16

*commission shall have the power to establish, and to order substituted therefor, such rates* or rules and regulations *as the commission determines to be just, reasonable and necessary*. If it is found that any regulation, *practice* or act, relating to any service performed or to be performed by such natural gas public utility for the public is in any respect *unreasonable, unjust, unfair, . . . the commission may substitute therefor such other* regulations, *practice*, service or act *as it determines to be just, reasonable and necessary. . . .*" (Emphases added.) K.S.A. 66-1,206(a).

The panel interpreted both K.S.A. 66-1,205(a) and K.S.A. 66-1,206(a), holding that "unreasonable" means "'[n]ot guided by reason; irrational or capricious'"; "unjust" means "'[c]ontrary to justice; not fair or reasonable'"; and "unfair" means "'[n]ot honest, impartial or candid; unjust.'" *Hanson*, 58 Kan. App. 2d at 95. The panel held: "Regardless of the rates included in TKO's contracts, the company's billing practice meets these definitions. TKO's calculations caused the company to inform its customers they were using—and to charge them for—9.5% more MMBTUs of gas than they actually received. *This practice was neither honest nor fair*." (Emphasis added.) 58 Kan. App. 2d at 95. And we note K.S.A. 66-1,207 requires the statutory provisions applicable to this controversy and all statutory grants of power, authority, and jurisdiction to the Commission "shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are expressly granted to and conferred upon the commission."

We look then to how the panel and district court came to a different conclusion than the Commission. As previously explained, the Commission gave a detailed justification as to why TKO's practice was lawful while giving at least seven reasons for rejecting the Irrigators' complaint. And under the KJRA, a reviewing court must examine those rationales within K.S.A. 77-621's boundaries. See K.S.A. 77-621(a)(2) ("[T]he validity of agency action shall be determined in accordance with the standards of judicial review provided in this section.").

17

TKO claims the Commission's "order, its factual findings, and its subject matter expertise regarding a complex area of public utility law" deserve judicial deference. The Irrigators, on the other hand, contend deference is unwarranted in this instance because the evidence does not support the agency's outcome. The Irrigators have the better argument. To arrive at its decision, the Commission explicitly considered: (1) Hanson's testimony, (2) Haynos' testimony, (3) the contracts, (4) the 34,856-U Docket Rule, (5) TKO's consistent use of a 13.45 psia pressure base in its Kansas operations, (6) TKO's revenue requirement, and (7) the reasonableness of the rates charged. Of those, the Commission considered the first three a substantial evidentiary basis to rule against the Irrigators.

First, the Commission noted, "Hanson explicitly stated that there is no requirement that a utility such as TKO must use *the same pressure base as their supplier*." (Emphasis added.) But when viewed in full, his testimony actually undermines the Commission's rationale. He testified:

> "[A. Hanson]. . . . The problem with TKO's calculations is they are using 13.45 as a pressure base for calculating the actual standard cubic feet of volume, but they are applying a Btu factor of 14.73 to that gas, which inflates the total MMBtu's by 9.5 percent.

> "[Q.] Is there any requirement or standard for TKO to use the same pressure base as the supplier?

> "[A.] No, there is no requirement. *The only requirement is the requirement to use the same pressure for the volume calculation and the Btu per cubic foot.*

> . . . .

18

"[A.] . . . [T]hat is the reason that most people adopt the pressure base of their supplier because the supplier will have the Btu calculation at their pressure base. And so generally . . . the company receiving gas from that supplier will go ahead and adopt that same pressure base, not necessarily, but it just makes it easier because you don't have to convert the Btu cubic foot that way.

. . . .

"[A.] . . . The meter measures the actual cubic feet at whatever pressure it goes through at. And then you convert it to your standard pressure base and that is generally 14.73. However, you could have whatever pressure base you really want to. . . . [P]eople use the pressure base of their supplier because they have already got the Btu's from their suppliers at that—whatever pressure base it is for their supplier." (Emphasis added.)

In essence, Hanson's testimony established that although there was no requirement to use the same reference pressure as the suppliers, there *was* a need to use *the same* pressure base *for both* the volume factor and the energy factor. Otherwise, a different pressure base would inflate or deflate the heat content—MMBtu—that is measured in volume. He said, "[P]eople use the pressure base of their supplier," because it is easier. So when considered in context, the Commission's reliance on Hanson's isolated statement that there was no requirement to use the same number as the supplier misses the mark.

A similar problem occurred when the Commission considered Haynos' testimony that "it does not matter what pressure base one uses so long as that pressure base is disclosed in the tariff or contract." This, of course, does not support the Commission's order because TKO's contracts did not disclose *any* pressure base. And the Commission seemed to recognize this in its final order when stating "the actual violation here is that it was not disclosed." Its reasoning that no error occurred because the contracts were silent about the pressure base, therefore, makes little sense in light of the problem, which is not

19

what pressure base TKO used to measure the delivered gas but how TKO manipulated it when invoicing customers.

In its order, the Commission also emphasized TKO "negotiated its contracts with [the Irrigators] with the price term established therein without reference to any pressure base for measurement; that TKO has not changed its method of calculating its customer bills over the time in question; and that the [Irrigators] accepted these terms until filing their Complaint." This implies the Commission believed the Irrigators somehow caused, or acquiesced in, TKO's use of an energy content per Mcf measured at a higher pressure as the amount of energy contained in each Mcf of the customers' usage metered at the lower 13.45 psia pressure base. But again the record contradicts this.

To begin with, nothing in the record supports a reasonable belief the Irrigators negotiated contract terms. Kirk Heger testified for Circle H Farms. He said he did not have a written contract with TKO until 2011. And even though Heger intervened in TKO's certificate proceedings as the Southwest Kansas Irrigation Association's president and conceded he did not object at that time, he noted TKO had not "disclosed to the Commission or to [him] that [it was] using a different pressure base to measure volume than [it] used to calculate the Btu factor." Tron Stegman, as a representative of Stegman Farms, agreed that he started paying TKO's invoices in 2007. But he also noted they did not have a written contract until September of 2011 and that contract did not explain how the MMBtu would be calculated.

The agency's final order correctly notes: "(1) Rome Farms' agreement does not appear to have been completed or executed"; (2) "Circle H Farms was unable to locate or produce an original contract assumed by TKO at the time of transfer of service"; and (3) Stegman Farms "did not have a contract with TKO prior to 2011 and had no contract with TKO's predecessor." But then the Commission incongruously suggested the parties

negotiated their contracts. That is not supported by the record. And the fact TKO consistently used 13.45 psia for invoicing purposes throughout its time doing business in Kansas does not excuse its unilateral and arbitrary tampering with the energy amount it charged the Irrigators for without disclosing what it was doing. Haynos testified:

> "[A. Haynos]. . . . [I]t's really about Btu per given volume. . . . When you use a pressure base as a reference point, *if you are going to use 13.45, fine, you can use whatever you want for a reference point provided you use the same data or reference points throughout all of your calculation. If you don't, you have two different reference points, you can't get it to be fungible.*

> . . . .

> "Q. If the contract between TKO and its customers had a pressure base of 13.45, would we have a dispute here?

> "A. Not necessarily . . . . [Y]ou can't just apply it to your volume. You have to apply it to your Btu value as well. That's the problem." (Emphasis added.)

Haynos also testified, "If you have no mention of a pressure base in your . . . contract . . . , we believe it goes back to the only requirement that would be there, the standard, which would be the old 1961 docket." But the Commission determined this rule was inapplicable because "[w]hat the reading of the 34,856-U Docket Rule and the testimony suggests is that there is not necessarily a violation for using a different pressure base" and decided "the 34,856-U Docket Rule is [not] a hardline rule on what pressure base shall be utilized . . . ." Admittedly, neither party seems to disagree about this conclusion, but again the evidence suggests—as well as the Commission's own findings—that "*the actual violation* here is that it was not disclosed." (Emphasis added.) And it is undisputed TKO never disclosed its use of a different pressure base.

21

As to TKO's revenue requirements, the Commission noted the parties' agreements authorized TKO to use a billing method that would meet its revenue requirement "to support the business of providing sufficient and efficient service of a natural gas public utility." August Ankum, who testified for TKO, said that given its revenue requirements, TKO should have received the same aggregate amount of money from its customers, even if it followed the Irrigators' preferred billing practice, so the parties' disagreement over pressure base "in no way means that [the Irrigators] have been overbilled." From this perspective, all TKO would have had to do was adjust its rates to meet its revenue requirement, leaving the customers no better or worse off because the customers' invoices would be the same.

But Haynos countered Ankum's analysis, noting TKO does not have a Commission-established revenue requirement. Rather, TKO set its own revenue requirement when negotiating contracts with its customers. And TKO could have negotiated to satisfy its revenue needs while telling its customers about the pressure base discrepancy that altered the energy content of the gas it sold to them.

Lastly, the order appears partially based on the Commission's factual finding that TKO's ultimate price remained reasonable despite its nondisclosure. That finding is supported by Haynos' second staff report: "TKO gas sales rate even with the misapplied BTU adjustment may be a reasonable rate." But this leaves it necessary for judicial review purposes to decide whether that alone was enough to support rejection of the Irrigators' complaint about TKO's unlawful billing practice. We think not given the broad statutory directive. See *Hanson*, 58 Kan. App. 2d at 95.

Considering the record as a whole, significant aspects of the Commission's factual basis are not supported by the evidence in the agency record. This is not simply because contradictory evidence exists, but because supporting evidence is lacking. At the same

22

time, the more important facts are undisputed. The Commission appears to have recast the testimony from Hanson and Haynos on which it chiefly relied, while ignoring the relevant points about how the pressure base alteration affected customers. This combination of contradictory evidence and lack of supporting evidence discredits the order's validity and justifies judicial relief from the agency action under the KJRA.

In its opinion, the panel appropriately interpreted K.S.A. 66-1,205(a) by giving effect to its plain language. See *Hanson*, 58 Kan. App. 2d at 95. And its ultimate decision reversing the Commission's ruling is correct. The Irrigators met their burden of proving TKO engaged in a billing practice that was unreasonable, unfair, or unjust because the utility unilaterally lowered the pressure base for the volume factor without adjusting the energy factor to account for the pressure base difference, and did not disclose what it was doing to either its customers or the Commission. TKO billed the Irrigators at a contract rate based on energy consumed but charged them for more energy (MMBtu's) than they received—regardless of whether the final amount the customers paid was reasonable. And even if we accept TKO's representation in its brief that MMBtu measurement is inherently imprecise, its billing practice stealthily injected an additional imprecision into its customer charges. TKO's calculating method constitutes an unlawful practice.

Of the seven considerations the Commission provided to support its decision, only the reasonable rates finding has a modicum of evidentiary support, but this is insufficient to carry the day on a billing practice complaint in light of the remaining uncontroverted evidence and statutory requirements. The Commission erred when it concluded the undisclosed "pressure base" practice did not violate K.S.A. 66-1,205(a) and K.S.A. 66-1,206(a). And despite TKO's argument to the contrary, remand is not required for the Commission to consider again the legal question of whether this undisclosed and material pricing practice violated state law. See *State v. Wilson*, 308 Kan. 516, 527, 421 P.3d 742 (2018) ("[T]he record is fully developed with respect to the narrow question of law

23

presented, and the parties do not dispute the relevant facts. For these reasons, a remand is unnecessary."). We affirm the panel's decision reversing the Commission on this point.

REMEDY

When the district court found TKO's billing practice unlawful, it remanded the case "to the Commission to calculate and order that TKO make refunds to its irrigation customers based on the 9.5% overbilling from the date TKO first began operations in Kansas *in 2007* to the present." (Emphasis added.) The panel held K.S.A. 66-1,206(a) grants the Commission the authority to initially craft an appropriate remedy when faced with a utility's unlawful practice under K.S.A. 66-1,205(a), rather than the district court. *Hanson*, 58 Kan. App. 2d at 96-97. We agree with the panel.

But that is not the precise question advanced by TKO in this court. The Commission ruled it "only had [administrative] jurisdiction over TKO from April 12, 2010 to the present." And the panel did not reach TKO's alternative argument that the district court ignored the Commission's jurisdictional finding by ordering a refund dating back to 2007. *Hanson*, 58 Kan. App. 2d at 97 ("Because we are reversing the court's refund order, we need not decide whether the timeframe of the previously ordered refunds—from 2007, not 2010—was also erroneous."). Here, TKO resurrects its jurisdictional question and asks us to give the Commission direction about its jurisdictional reach if we agree with the panel to remand for imposition of a remedy, which we do.

Like the panel, we fail to see why this should be considered now. This jurisdictional issue is either not ripe since the Commission has yet to craft an appropriate remedy, or moot since the panel reversed the district court's refund order. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896, 179 P.3d 366 (2008) (courts do not consider

24

issues that are not ripe); *State v. Roat*, 311 Kan. 581, 586, 466 P.3d 439 (2020) (generally courts do not address moot issues). This is a fatal defect in achieving further judicial review at this juncture. See *Sierra Club v. Mosier*, 305 Kan. 1090, 1102, 391 P.3d 667 (2017) ("Kansas courts do not consider issues unless the issues are ripe, meaning they have 'taken fixed and final shape rather than remaining nebulous and contingent.'"). We decline to address this anticipatory question.

Judgment of the Court of Appeals affirming in part and reversing in part the district court is affirmed on the issues subject to review. Judgment of the district court is affirmed in part and reversed in part. The case is remanded to the Kansas Corporation Commission with directions.